Pages 1 - 69

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Before The Honorable William Matthewman, Magistrate Judge

```
UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )        NO. 23-CR-80034-KAM
                               )
ARISTIDE MEZZOIUSO,            )
                               )
            Defendant.         )
_____)
```

West Palm Beach, Florida
Wednesday, March 8, 2023

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

Digital Audio Recording 10:29 a.m. - 10:32 a.m.
and 11:06 a.m. - 12:27 p.m. = 84 minutes

**APPEARANCES:**

For Plaintiff:

        JUAN ANTONIO GONZALEZ
        United States Attorney
        99 Northeast Fourth Street
        Miami, Florida 33132
    **BY: ELENA SMUKLER, ESQ.**
        **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:

        JONATHAN S. FRIEDMAN, P.A.
        101 Northeast Third Avenue, Suite 1500
        Fort Lauderdale, Florida 33301
    **BY: JONATHAN S. FRIEDMAN, ESQ.**
        **ATTORNEY AT LAW**

Transcribed By:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

I N D E X

Wednesday, March 8, 2023 - Volume 1

**GOVERNMENT'S WITNESS**                                    **PAGE  VOL.**

**MILLER, LOUISE**
(SWORN)                                                      20    1
Cross-Examination by Mr. Friedman                            20    1
Redirect Examination by Ms. Smukler                          38    1

**DEFENDANT'S WITNESS**

**ARENA, JOSEPH**
(SWORN)                                                      57    1
Direct Examination by Mr. Friedman                           57    1

| | |
|---|---|
| 1 | **Wednesday - March 8, 2023**                          **10:29 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | **THE CLERK:**  Calling United States of America versus |
| 5 | Aristide Mezzoiuso, 23-CR-80034-Marra, slash, McCabe. |
| 6 | **THE COURT:**  All right.  Who's here for the |
| 7 | United States? |
| 8 | **MS. SMUKLER:**  Good morning, Your Honor.  Elena Smukler |
| 9 | on behalf of the United States. |
| 10 | **THE COURT:**  Good morning. |
| 11 | And who's here for the defendant? |
| 12 | **MR. FRIEDMAN:**  Good morning, Your Honor. |
| 13 | Jonathan Friedman.  I'm here on behalf of Mr. Mezzoiuso. |
| 14 | **THE COURT:**  Good morning. |
| 15 | And we have Mr. Mezzoiuso here. |
| 16 | If we could swear him in, please. |
| 17 | **THE CLERK:**  Yes, Judge. |
| 18 | Please raise your right hand. |
| 19 | You do solemnly swear that the statements you're about to |
| 20 | make to this Court will be the truth, the whole truth, and |
| 21 | nothing but the truth, so help you God? |
| 22 | **THE DEFENDANT:**  Yes. |
| 23 | **THE COURT:**  Could you speak into the microphone, |
| 24 | please. |
| 25 | **THE DEFENDANT:**  Yes. |

```
 1              THE COURT:  All right.  And state your name for the
 2       record.
 3              THE DEFENDANT:  Aristide Mezzoiuso.
 4              THE COURT:  All right, sir.  Well, you're here today,
 5       Mr. Mezzoiuso, for a detention hearing in this case.
 6          Are the parties ready to proceed?
 7              MS. SMUKLER:  Yes, Your Honor.
 8              MR. FRIEDMAN:  We are, Judge.
 9              THE COURT:  Okay.  So about how long do counsel
10       believe this detention hearing will -- will take?
11              MS. SMUKLER:  30 minutes?  20 minutes?
12              MR. FRIEDMAN:  Judge, the Government is suggesting 30
13       minutes.  I do have some witnesses, some close family members,
14       that are here that are going to testify as well.
15          So --
16              THE COURT:  Okay.  We're going to pass the matter.  I
17       want to take care of the other matters first before we spend
18       that much time on a detention hearing.  I want to make sure
19       that the defendant has enough time and see if we can get some
20       other counsel out of here and some other cases resolved that
21       will be quicker.
22          So let's pass that --
23              MR. FRIEDMAN:  Thank you.
24              THE COURT:  -- and we'll come back to that --
25              MR. FRIEDMAN:  Thank you.
```

1          **THE COURT:**  -- in just a little while.

2          **MR. FRIEDMAN:**  Thank you, Judge.

3               (Discussion regarding other cases.)

4          (Digital audio recording begins as follows:)

5          **MS. SMUKLER:**  -- on behalf of the United States.

6          **THE COURT:**  All right.  And who's here for the

7   defendant?

8          **MR. FRIEDMAN:**  Jonathan Friedman on behalf of the

9   defendant, Judge.

10          **THE COURT:**  All right.  And we have Mr. Mezzoiuso

11   here, who I believe has already been sworn; correct?

12          **MR. FRIEDMAN:**  That's correct.  You did.

13          **THE COURT:**  All right.  And he doesn't need an

14   interpreter.  So you can have a seat, and this is a detention

15   hearing in this case.

16       And, Ms. Smukler, I think you probably advised me the

17   other day, but the Government is moving for pretrial detention

18   on -- on which statutory bases?

19          **MS. SMUKLER:**  Under (f)(1)(E).

20       I also -- I did previously advise Your Honor there is a

21   rebuttable presumption under 3142(e)(3)(E), and we are arguing

22   the defendant is both a risk of flight and a danger to the

23   community.

24          **THE COURT:**  All right.  So you're moving for detention

25   under the statutory -- (f)(1)(E) of 3142 and also (f)(2)(A) on

1   serious risk of flight?

2        **MS. SMUKLER:**  Yes, Your Honor.

3        **THE COURT:**  And there's a rebuttable presumption under

4   (e)(3)(E)?

5        **MS. SMUKLER:**  Yes.

6        **THE COURT:**  Okay.  So what I'm going to do is I'm

7   going to take judicial notice of the indictment in

8   Case 23-CR-80038.  I'm also going to take -- all right.  I'm

9   sorry.  That's -- give me just a second, make sure I have the

10  right file here.

11       All right.  I'm going to take judicial notice of the

12  indictment in 23-CR-80034, Judge Marra and Judge McCabe.  I'm

13  also going to take judicial notice of the abbreviated

14  Pretrial Services report and the Pretrial Services report, the

15  typed version and the handwritten version both.

16       And the Government -- Ms. Smukler, you can proceed by

17  proffer.  What's this case all about, and why is the Government

18  seeking detention?

19       **MS. SMUKLER:**  Yes, Your Honor.

20       The defendant --

21       **MR. FRIEDMAN:**  Judge -- Judge, just some -- on the

22  Pretrial Service report, there are a couple of corrections.

23  They're not minor -- they're not major.

24       **THE COURT:**  All right.  We'll get to that when I --

25  when I go to you.  We'll get to that --

1          **MR. FRIEDMAN:**  Sure.

2          **THE COURT:**  -- and go from there.

3     Go ahead, Ms. Smukler.

4          **MS. SMUKLER:**  Yes, Your Honor.

5     The defendant is charged, by indictment, with one count of

6 attempted coercion and enticement of a minor in violation of

7 18, United States Code, 2422(b), and one count of attempted

8 transportation of a minor with the intent to engage in sexual

9 activity in violation of 18, United States Code, 2423(a).

10    The minor victim in this case was a minor at the time and

11 is a Bahamian national.  In the summer of 2020, the minor

12 victim traveled to the United States, where she met this

13 defendant.  She returned to the Bahamas in August 2020.

14    From September to October of 2020, the defendant and the

15 minor victim communicated via Facebook and WhatsApp.  During

16 their conversations, which were inappropriate and sexual in

17 nature, the defendant attempted to entice the victim to come

18 back to the United States and to have sex.

19    Their communications were recovered from the minor

20 victim's phone upon her return to the United States in

21 October 2020 and are the basis for the charges in this

22 indictment.

23    On October 19th, 2020, the 16-year-old minor victim -- or

24 17-year-old minor victim was encountered by law enforcement.

25 She was interviewed by law enforcement at the time and stated

1   that she had arrived from the Bahamas on October 16th of 2020.

2       She further stated that she previously visited the

3   United States in July 2020 to visit her female friend.  The

4   minor victim stated that her friend would set the minor victim

5   up with older rich men to have sex for money.

6       Law enforcement obtained records from CBP and confirmed

7   that the minor victim did travel to the United States in July

8   of 2020 and returned to the Bahamas on August 28th, 2020.  They

9   confirmed that the minor victim had returned from the Bahamas

10  to the United States on October 16th, 2020, just three days

11  before the encounter.

12      The minor victim was interviewed on several occasions.

13  During one of the interviews, the minor victim provided

14  information regarding a commercial sex act customer, who she

15  identified as Ari.  Law enforcement identified Ari as this

16  defendant, who was a 62-year-old male.

17      The minor victim advised that her female friend that she

18  was staying with arranged a date with this defendant via

19  Tinder.  According to the minor victim, this defendant provided

20  a ride to his home by utilizing a ridesharing program like Lyft

21  or Uber.  The minor victim advised the vehicle was sent to her

22  friend's house and that she took it for approximately one hour

23  to arrive at this defendant's house.

24      The minor victim stated that the agreed -- agreed-upon fee

25  for oral sex was $200.  She stated that the defendant paid her

a hundred dollars directly in cash and then sent the remaining hundred dollars to her female friend via Cash App.  The minor victim advised that, after the date, she had an additional two dates with the defendant, during which she and the defendant had sex.

The minor victim failed to identify this defendant in a photograph.  However, in addition to the fact that the defendant admitted to being the person who later chatted with the minor victim in a post-*Miranda* interview, the -- I -- the defendant was also identified through law enforcement investigation as follows:

A review of the minor victim's phone revealed WhatsApp chat messages between the minor victim and the user of a phone number ending in 2327.  That's the number the defendant, during a post-*Miranda* interview, admitted to having at the time.  The WhatsApp account for Telephone Number 2327 includes a photograph of this defendant.

Law enforcement obtained records for that phone number ending in 2327.  Law enforcement learned that the billing party was Best Doctors Insurance Holding, which was this defendant's former employer, as indicated by his wages and earning report and is also in the Pretrial Services report, and that this defendant is listed as a user of the phone number by AT&T.

Law enforcement also obtained a subpoena for records from Lyft, a ridesharing program for the defendant, which used his

1   full name, phone number, and a picture of this defendant.

2        The records reveal that, on the evening of July 13th,

3   2020, while the victim was in the United States, the

4   defendant's Lyft account was used to pick up a passenger at the

5   minor victim's friend's house and drop her off at the

6   defendant's house.

7        The next morning, on July 14th, 2020, the Lyft account --

8   this defendant's Lyft account was used to pick up the passenger

9   from his house and drop the passenger back -- back off at the

10  minor victim's friend's house.

11       A search warrant was obtained for historical cell site

12  information for the minor victim's phone.  The minor victim's

13  phone corroborates that the minor victim's phone traveled from

14  the area of her friend's house to the defendant's house on the

15  evening of July 13th and then, the next morning, consistent

16  with the Lyft account, shows that the phone traveled from the

17  location of the defendant's house to the location of the minor

18  victim's house on July 14th of 2020.

19       Law enforcement also obtained a subpoena for records from

20  Cash App for this defendant's phone number.  The Cash App

21  records reveal that, on the morning of July 14th, 2020, when

22  the minor victim would have gone back home, the defendant

23  attempted to send the minor victim's friend $200 but was

24  unsuccessful.

25       Later, the same morning, the defendant sent the minor

1  victim's friend a hundred dollars via Cash App and, in the

2  "Notes" section of the transaction, wrote, "For" minor victim's

3  first name.  The sender was listed as Ari, and the source of

4  the payment was this defendant's bank account, as confirmed

5  through subpoenas.

6      The minor victim's cell phone was forensically analyzed by

7  law enforcement.  A review of the minor victim's cell phone

8  revealed Facebook chat messages between the minor victim and

9  Facebook user Ari Mezzoiuso beginning after the minor victim

10 returned to the Bahamas in August of 2020.

11     On October 1st, 2020, the defendant asks the minor victim

12 if she wants to come back and if she would stay with him.  When

13 the minor victim asks, "To live?" he responds by saying, "If

14 you want, yes."

15     The minor victim stated she did not want to, and could

16 not, live with the defendant.  When the defendant asked her

17 why, the minor victim stated she was not ready.  The defendant

18 responded by stating, "I don't care about age."  The minor

19 victim was 17 at the time.  The defendant was 62.

20     A review of the minor victim's cell phone revealed

21 WhatsApp chat messages between the minor victim and the

22 defendant at his phone number.

23     On October 1st, 2020, the defendant asked the minor victim

24 if she wanted him to buy a round trip or one-way ticket to the

25 United States.  When the minor victim tells him she'll need a

1  round-trip flight, the defendant asks how long she'll stay.

2      The minor victim tells the defendant she cannot give him

3  her passport information.  The defendant responds, "I can't pay

4  for your flight, then.  We met once, and then you never" --

5  or -- spelled incorrectly, "stayed in touch.  I tried many

6  times to reach you, remember?"

7      On October 4th, 2020, the defendant states -- tells the

8  minor victim that he wants to try two things, if she's

9  open-minded, stating, "I'll take care of you, of course."  He

10 tells her he will take care of her on multiple occasions

11 throughout the chat.

12     He offers to fly to the Bahamas to meet the minor victim

13 and tells her to "Find a 16-year-old to join us" and,

14 separately, "Find a man close to my age to join us."  The

15 defendant tells the minor victim he wants "to see a girl,

16 please" and asks if the minor victim is down.

17     The defendant tells the minor victim that he read that the

18 legal age for sex is 16 in the Bahamas.  When discussing

19 another person joining them, the defendant states, "Because I

20 would want to see him F-word you.  I would F-word you, too.

21 That's the fun I'm talking about."

22     On October 5th, 2020, the defendant messages the minor

23 victim, saying, "Babe, the first day I'm there," referring to

24 the Bahamas, "it will just be me and you.  I want to have sex

25 alone with you.  Then we invite a 16-year-old and then a guy.

1   I definitely want to see you get F-word."

2       And when I say "F-word," I'm using an abbreviation for the

3   actual word used during the text.  "Do you want to come back

4   with me to Miami afterwards?  If yes, you can [sic] with me for

5   as long as you want.  I'll buy you the return ticket to Nassau

6   whenever you want to go home."

7       The defendant tells the minor victim he is going to get

8   tested and asks if she is going to get tested.  When she asks

9   if he wants her to, the defendant states he does not want to

10  wear a condom.

11      At one point in the conversation, the minor victim

12  confirms she's not 18.  The defendant sends her a color-coded

13  map of the United States showing where it is legal to have sex

14  with someone under 18.

15      On October 8th, 2020, the defendant tells the minor

16  victim, "I want to spend time effing you every day we're

17  together and maybe have another join us one night."  He tells

18  the minor victim that he will fly to Atlanta and fly her there

19  to meet him.

20      The defendant tells the minor victim, "By the way, if

21  you've never done a threesome with two guys, you'll love it.

22  Trust me."  He then sends the following series of messages:

23      "The legal age for sex in Atlanta is 16.  So we can F no

24  problem, and I'll treat you nicely and look after you.  I can

25  teach you things, babe.  You're in good hands with me.  I'll

1    protect you as well."

2        "Send all your information so I can book your trip.  When

3    do you want to fly?  Any time, starting Saturday?  Pick the

4    date.  I think you suggested Friday the 16th, but you can come

5    sooner."

6        "Remember, I'm getting tested for STDs and HIV tomorrow.

7    I'll send you the results.  I do this a few times a year to be

8    safe, also because I don't like using a condom.  Is that okay?

9    I want you to feel me inside you without the condom in the way.

10   If you like to spend time with me, we can discuss you moving in

11   with me when the time is right."

12       While the defendant -- defendant initially seems intent on

13   having sex with the minor victim in another state where he

14   claims it's legal, he's ultimately discussing having sex with

15   the minor victim at his home in the Southern District of

16   Florida.

17       At one point in the conversation, the minor victim

18   explains that she's coming to the United States with her

19   brother and his girlfriend.  The defendant suggests that they

20   stay with him at his home in the Southern District of Florida.

21       The defendant tells her that the rooms are far apart.  He

22   states, "So you would not hear them, and they would not hear

23   us."  The defendant then asks the minor victim, "Your brother

24   would not mind us having sex?"  The minor victim tells the

25   defendant that they can just have sex at night.  The defendant

1   responds, saying, "Except cannot invite another guy."

2       The defendant then proceeds to have a conversation with
3   the minor victim about having a threesome and tells her that
4   having a threesome is for her and about pleasing her.  He also
5   suggests taking the minor victim to a hotel.

6       On October 9th, 2020, the defendant asks the minor victim
7   what she likes to do for fun so he can plan what to do.  He
8   suggests taking her to Xtreme Action Park, Gulfstream Park,
9   Hard Rock Casino, "if they allow your age," he says.

10      He then states, "We'll have to wait until your brother and
11  his girl fall asleep to have sex.  LOL," referring, again, to
12  them having sex in his home in the Southern District of
13  Florida.

14      On October 12th, 2020, the defendant, again, states,
15  "Babe, if having another guy join us turns you off, just let me
16  know.  It's not a requirement."

17      The minor victim states that she isn't sure she wants to
18  do anything anymore, stating, "That's not the right way to make
19  money."

20      He responds, stating, "It's just for fun.  We can date, if
21  you want, instead."  He does -- then tells the minor victim
22  that he can take care of her.

23      On October 12th, 2020, the minor victim asks the defendant
24  if Atlanta is where it is legal to have sex.  She wants to
25  confirm that it's legal to have sex at 16 there.  In the

1  conversation that follows the question, the defendant asks,

2  "You don't want to F me when you stay at my house with your

3  brother and his girlfriend?  I thought you did."

4      During the conversation, the defendant asks the minor

5  victim if she is going to see him in Florida.  He offers to

6  pick up the minor victim and spend time with her but not sleep

7  over.

8      When the minor victim agrees, the defendant states, "Cool.

9  We'll go to Xtreme Action Park, but we're definitely effing

10  when you arrive (Inaudible), babe.  I want you to get used to

11  my," expletive for genitals.  "Okay?  I'll marry you

12  eventually, if you want.  Please don't think that's just

13  because I test sexual things, I'm being disrespectful.  I'm

14  not, rest assured.  I'm not being disrespectful.  I sincerely

15  like you."

16      In October 2020, the victim did, in fact, return to the

17  United States.  However, three days later, she was encountered

18  by law enforcement.  Just three days after that, she was then

19  placed in DCF custody due to her being underage and until her

20  18th birthday.

21      Now, there are some additional facts that are not charged

22  that I'd like to bring to Your Honor's attention.

23      On February 7th, 2022, the defendant returned to Miami

24  from a cruise that traveled to the Bahamas.  The defendant's

25  phone was obtained and searched upon his reentry.  A review of

the phone reveals a conversation via WhatsApp with a phone

number with a Panamanian country code saved to the phone as

"Mara."

During the conversation on April 20th of 2021, the

defendant asks the female if she has had sex with someone

younger.  When the female says, "No," this defendant asks if

she has any interest.  Mara states that she does not have

interest, but maybe in a few years.

He says, "I'd like to see that young teen, 14 or 15, with

a nice-sized penis.  Many countries, 14 is legal, Brazil and

Colombia, Bolivia and Ecuador, Paraguay and Peru."

A review of the phone also revealed a conversation via

WhatsApp with a phone number with a Lithuanian country code

saved to the phone as "Vilte."  A records check revealed that

the phone number was a female with the first name -- with the

same first name, who is a Lithuanian national and holds a

Lithuanian passport.

During the conversation on March 13th of 2021, the

defendant asks Vilte how old she was when she began "doing

this," he says.  Vilte responds that she has been meeting with

different guys since she was 16.  Mezzoiuso asks -- Mezzoiuso

asks if she's 22 now.  She responds that she is 19.  He states,

"I like" -- "I like younger.  So cool."

At one point, in the conversation, she [sic] asks, "When

you were 16, how old was the oldest guy that F'ed you?"  When

1  she responds, "Maybe 55," he states, "That's hot, I think.

2  Never done that."  He then tells Vilte that he obeys laws.  He

3  states, "Maybe if I travel to Brazil, the age is 14."  He tells

4  Vilte that he wishes he met her when she was 16.

5       When she says, "Hmm.  You obey the law?" he says, "Met you

6  in Brazil, find you an 18-year-old bore" -- "boy.  I prefer 16,

7  but it's too risky.  Maybe we can travel together to a country

8  where the legal age is younger.  We'll see.  Actually, there

9  are states in the United States where the legal age is 17."

10      When Vilte states that she does not want a 16-year-old kid

11  and she is not for kids, as they don't know how to F, the

12  defendant states, "We teach them."  When Vilte pushes back

13  again, he states, "Okay.  18, then."  Vilte, again, expresses

14  disinterest and states that maybe she can do it once.  He

15  responds, stating, "Only once is fine.  Keep me happy in bed,

16  and I'll keep you happy."

17      During the conversation, this defendant and Vilte discuss

18  her coming to the United States and what she should tell

19  Customs officials when she -- when she arrives.  He tells Vilte

20  that she can give his address and tell Customs that she is just

21  there on vacation.

22      I'd like to note also that, in addition to the travel to

23  the Bahamas, the defendant later traveled to Jamaica in August

24  '22.

25      I do have additional argument, but that concludes the

1  factual proffer.

2          **THE COURT:**  All right.  Thank you.

3      Mr. Friedman, how would you like to proceed?

4          **MR. FRIEDMAN:**  Judge, I'd like to cross-examine the

5  agent.

6          **THE COURT:**  All right.  If we can have the agent come

7  up, please.

8          **THE CLERK:**  Please raise your right hand.

9      You do solemnly swear that the testimony you're about to

10  give will be the truth, the whole truth, and nothing but the

11  truth, so help you God?

12          **THE WITNESS:**  I do.

13          **THE CLERK:**  Thank you.

14          **THE COURT:**  And please state your name and spell it

15  for the record.

16          **THE WITNESS:**  My name is Louise Miller, L-o-u-i-s-e.

17  Miller, M-i-l-l-e-r.

18          **THE COURT:**  All right.  And where are you employed?

19          **THE WITNESS:**  I'm employed with Homeland Security

20  Investigations.

21          **THE COURT:**  And your position?

22          **THE WITNESS:**  I'm a Special Agent.

23          **THE COURT:**  All right.  Thank you.

24      Go ahead, Counsel.

25          **MR. FRIEDMAN:**  Thank you, Judge.

MILLER - CROSS / FRIEDMAN

1                     **LOUISE MILLER**,

2  called as a witness for the Government, having been duly sworn,

3  testified as follows:

4                   **CROSS-EXAMINATION**

5  **BY MR. FRIEDMAN:**

6  **Q.**   Good morning, Agent Miller.

7  **A.**   Good morning.

8  **Q.**   You heard the proffer by the Assistant United States

9  Attorney.

10     Did you provide all of that information to Ms. Smukler?

11  **A.**   Yes.

12  **Q.**   Okay.  Are you the underlying investigative agent in this

13  case?

14  **A.**   This case was investigated with the Palm Beach County

15  Sheriff's Office --

16  **Q.**   Okay.

17  **A.**   -- and they conducted the first few interviews with the

18  victim.

19  **Q.**   And when did you get involved in this case?

20  **A.**   I believe December of 2020.

21  **Q.**   December of 2020.

22     Okay.  And in December of 2020, were you made -- was --

23  were the text messages that the Government alluded to in their

24  proffer made available to you?

25  **A.**   Yes.  I don't know the date that the -- when we got back

1  the cell phone extraction --

2  **Q.**  Uh-huh.

3  **A.**  -- but, yes, they were made available to me.

4  **Q.**  And back in 2020, December of 2020, were you able to

5  identify the person that the minor, the 17-year-old, was

6  texting with?

7  **A.**  Yes.

8  **Q.**  Okay.  And who was that person?

9  **A.**  Mr. Mezzoiuso.

10  **Q.**  Okay.  So back -- we're talking almost three years ago --

11  over -- almost three years ago, two years shy of three, you

12  have known the identity of the defendant in this case; correct?

13  **A.**  Correct.

14  **Q.**  And the victim we're talking about -- there's one alleged

15  victim in this case; is that correct?

16  **A.**  Correct.

17  **Q.**  And there's been two counts charged in the indictment, and

18  those two counts deal with the attempt; is that correct?

19  **A.**  That's correct.

20  **Q.**  And at the time that Mr. Mezzoiuso was texting with this

21  minor, she was 17 at all times?

22  **A.**  Correct.

23  **Q.**  What is her date of birth, and when did she turn 18?

24  **A.**  Her date of birth is May 8th, 2003.

25  **Q.**  Okay.  Do you investigate sex crimes?

MILLER - CROSS / FRIEDMAN

1   A.   I investigate human trafficking crimes, which includes sex

2   trafficking and labor trafficking.

3   Q.   Okay.  And in all -- and how long have you been doing

4   that?

5   A.   Approximately five years.

6   Q.   And in your five years of investigating these cases, have

7   you ever came across the defendant, his name, in any of your

8   investigations --

9   A.   I have --

10   Q.   -- before?

11   A.   I have not.

12   Q.   Okay.  And you did a background search on Mr. Mezzoiuso;

13   correct?

14   A.   I did.

15   Q.   And he has no record whatsoever; is that correct?

16   A.   That's correct.

17   Q.   Okay.  And you learned that he's a United States citizen;

18   correct?

19   A.   Correct.

20   Q.   Okay.  Did you do any surveillance of his residence after

21   identifying him from the text message?

22   A.   I don't believe so.  From my recollection, I don't believe

23   that we did, no.

24   Q.   Okay.  And when you spoke with the alleged victim, the

25   17-year-old, did she indicate that she had sex with my client?

**MILLER - CROSS / FRIEDMAN**

1  **A.**   She did.

2  **Q.**   And what was the nature of that sexual activity?

3  **A.**   She disclosed that she performed oral sex on him and that

4  they later had vaginal intercourse.

5  **Q.**   Uh-huh.

6      Did you find any text messages between my client and

7  the -- the 17-year-old that corroborated that they actually had

8  sex that one day that the Government has alluded to in their

9  proffer?

10  **A.**   Her text messages had been deleted, and so had his.  So I

11  did not.

12  **Q.**   So -- so there was no evidence that they had sex other

13  than her statement when she was basically interrogated; is that

14  correct?

15  **A.**   Interrogated or interviewed?

16  **Q.**   When you questioned her.

17  **A.**   Yes.  When we interviewed her, that is what she disclosed

18  to law enforcement.

19  **Q.**   And at some point, you mentioned that she was taken into

20  custody, to DCF custody; correct?

21  **A.**   That's correct.

22  **Q.**   And when you interviewed her, did you do that interview?

23  **A.**   I was present for a third interview with her --

24  **Q.**   Uh-huh.

25  **A.**   -- which was in December.

**MILLER - CROSS / FRIEDMAN**

1  **Q.**   And it was suggested to her, during that interview, that

2  she was potentially violating laws; is that correct?

3  **A.**   Can you clarify that?

4  **Q.**   Well, what was -- who did the interview with the

5  17-year-old?

6  **A.**   Detective Tremino with the Sheriff's Office.

7  **Q.**   And what was the purpose of the interview?

8  **A.**   To further investigate when she first came to the

9  United States --

10  **Q.**   Uh-huh.

11  **A.**   -- what had occurred since she had been in the

12  United States.

13  **Q.**   And was that video-recorded or audio-recorded?

14  **A.**   It was audio-recorded.

15  **Q.**   Okay.  Do you have a copy of that with you today?

16  **A.**   Today?  No.

17  **Q.**   Okay.  And during that interview -- how long did that

18  last?

19  **A.**   Approximately an hour and a half, two hours.  I don't

20  recall exactly.

21  **Q.**   And everything that she said in this interview -- did you

22  take everything she said as the truth, or did you suspect that

23  some of the things that she was saying may be not -- not true?

24  **A.**   We always -- when we interview victims, we take their

25  statement, but we always attempt to corroborate their

MILLER - CROSS / FRIEDMAN

1   statement --

2   **Q.**   Okay.

3   **A.**   -- as well with evidence.

4   **Q.**   So with evidence.

5       And in this case, you indicated just a moment ago that

6   there was no evidence to corroborate her statement that she had

7   engaged in any type of sexual activity with my client; is that

8   correct?

9   **A.**   We have circumstantial evidence that they had met at his

10  home and that she was in his house.

11  **Q.**   Right.

12      And let's talk now -- because you've reviewed all the text

13  messages.  There's hundreds of pages of text messages; correct?

14  **A.**   Correct.

15  **Q.**   All right.  During some of the text-messaging,

16  Mr. Mezzoiuso makes a point that testing sexual disease -- you

17  know, transmittible diseases is important to him; right?

18  **A.**   Correct.

19  **Q.**   Right?

20      That's a -- that's a subject matter of discussion;

21  correct?

22  **A.**   Yes.

23  **Q.**   And Mr. Mezzoiuso wanted -- or at least in the

24  text-messaging, suggested, "Well, if we do meet, I want you to

25  be tested"; is that correct?

1   **A.**   I don't remember his specific wording, if he said "if we

2   do meet."  He did indicate he was going to get tested and asked

3   her to do the same.

4   **Q.**   Right.

5        So on this one occasion that she came into town -- and I

6   believe that was in October -- I'm sorry -- July, July of 2020;

7   right?  July 13th, 2020 -- there's absolutely no evidence that

8   he had communicated with her prior to that time; is that

9   correct?

10   **A.**   Correct.

11   **Q.**   So there's no evidence to this Court that he enticed her,

12   lured her, instructed her, requested her to come to the

13   United States from the Bahamas; is that correct?

14   **A.**   The charging time of the indictment is not those dates.

15   It's October.

16   **Q.**   I understand, but I'm talking about the first time that he

17   had met her.  She was already in the United States; correct?

18   **A.**   That is correct.

19   **Q.**   Right.

20        And getting back to her statement during her interview

21   that she engaged in oral sex with my client, other than her

22   saying that, there's absolutely no evidence, direct evidence,

23   that that took place; is that correct?

24   **A.**   That's correct.

25   **Q.**   Okay.  And then she -- does she go back to the Bahamas?

MILLER - CROSS / FRIEDMAN

```
 1  A.    She did.

 2  Q.    Okay.  And then that's where the text-messaging picks up

 3  sometime in the beginning of October 2020; is that correct?

 4  A.    Yes.

 5  Q.    All right.  And during all of the texting back and forth

 6  between my client and the 17-year-old, he is aware that she's

 7  17; correct?

 8  A.    Correct.

 9  Q.    And in all of the conversations and all those hundreds of

10  pages, he is trying to figure out where he can have sex, if he

11  is even going to have sex with her, in a legal manner; isn't

12  that correct?

13  A.    He sent a map of Georgia, but at the end of the text

14  messages, he talked about having sex with her at his house in

15  Lighthouse Point.

16  Q.    Let me ask you a question.

17        Is it legal for somebody to have sex with somebody who is

18  17 years old in the state of Georgia?  Yes or no?

19  A.    Yes.

20  Q.    Okay.  Is it legal for someone to have sex with somebody

21  who is 17 years old in the country of the Bahamas?

22  A.    Yes.

23  Q.    All right.  So by Mr. Mezzoiuso suggesting that "We can

24  meet in Atlanta, Georgia," there's nothing unlawful about that,

25  is there?  Yes or no?
```

MILLER - CROSS / FRIEDMAN

1    **A.**   No.

2    **Q.**   Okay.  By him suggesting that he can travel to the

3    Bahamas, where she is from, and they can have sex in the

4    Bahamas, there is nothing unlawful about that.  She's 17 years

5    old, just -- just several months shy of her 18th birthday, but

6    there's nothing illegal about that; is that correct?

7    **A.**   Correct.

8    **Q.**   She never comes to Florida -- is that correct? -- after

9    the texting going on in the beginning of October of 2020?

10   **A.**   She does come.

11   **Q.**   When she comes, does she come to his home, my -- I'm

12   sorry?

13   **A.**   No.

14   **Q.**   So she never comes to his home; is that correct?

15   **A.**   Correct.

16   **Q.**   She doesn't make any allegations that he engaged in any

17   sexual activity with her; correct?

18   **A.**   Yes, she did, when she disclosed about the July contact.

19   **Q.**   But, again, we're going back to just her word with no

20   evidence to support that.  Yes?

21   **A.**   Circumstantial evidence, we have.

22   **Q.**   I -- I know that, but there's nothing -- it's her -- it's

23   her word -- it's an Uber or Lyft receipt showing that she went

24   to his home, but there's absolutely no evidence that he engaged

25   in sexual activity with this woman?

```
 1            MS. SMUKLER:  Objection.  Asked and answered.

 2            THE COURT:  Sustained.

 3   BY MR. FRIEDMAN:

 4   Q.   Now, at some point, when she is now 18 years old, do you

 5   learn that she then comes and actually stays with

 6   Mr. Mezzoiuso?

 7   A.   Mr. -- Mr. Mezzoiuso, post-Miranda, stated that.  Once we

 8   finished our fact-finding interviews with the victim -- we have

 9   advocates that work with the Sheriff's Office.  They then start

10   working with the victim.

11        I have not spoken to the victim in quite some time.  I

12   know that's what Mr. Mezzoiuso indicated in that -- in the

13   interview.  I have not confirmed that or asked the victim if

14   that is, in fact, accurate.

15   Q.   So if she did, in fact, stay with him after she had turned

16   18, clearly, nothing unlawful about that; correct?

17   A.   That's correct.

18   Q.   Did you do any investigation to find out the truth or

19   validity behind those assertions that she came when she was 18

20   and then stayed in his home?

21   A.   No, not -- we interviewed him on Friday, this past Friday.

22   Q.   Uh-huh.

23   A.   I have not spoken to the victim since Friday.

24   Q.   You didn't get on the phone just to -- last Friday to ask

25   if she had actually lived with him when she was legally 18
```

**MILLER - CROSS / FRIEDMAN**

1   years of age?

2   **A.**   No, because it's irrelevant, if she lived with him when

3   she was 18.

4   **Q.**   Now, there was a time in 2022, I think the Government

5   alluded in their proffer, that Mr. Mezzoiuso was stopped after

6   coming home from a cruise; is that correct?

7   **A.**   Yes.

8   **Q.**   And during that stop, he was questioned; correct?

9   **A.**   Yes.

10  **Q.**   And do you know why he was stopped?  Why was he picked out

11  of all the passengers that got off the cruise ship?

12  **A.**   When she identified him, he was a subject of our

13  investigation.  So when he crossed the border from coming back

14  from the Bahamas, he was pulled aside for questioning.

15  **Q.**   Okay.  And he was also a subject of the investigation back

16  in 2020; correct?

17  **A.**   Correct.

18  **Q.**   So two years now go by.  He's stopped in the port, coming

19  through from going on a cruise, and his phone is taken from

20  him; is that correct?

21  **A.**   Correct.

22  **Q.**   Okay.  Did he consent to have that phone taken from him?

23  **A.**   No.

24  **Q.**   All right.  Customs just -- just took the phone?

25  **A.**   Correct.

MILLER - CROSS / FRIEDMAN

1   **Q.**   Did they have any basis for taking the phone?

2        **MS. SMUKLER:**  Objection to relevance.

3        **THE COURT:**  Right.

4   I'll -- I'll sustain that.  I think the border-crossing

5   allows Customs to search whatever a person has on them when

6   they enter the United States.

7   **BY MR. FRIEDMAN:**

8   **Q.**   Was that phone returned to him, or was it taken from him

9   completely?

10  **A.**   No.  It was seized.

11  **Q.**   Okay.  So it wasn't just searched.  It was completely

12  seized and never returned to my client?

13  **A.**   That's correct.

14  **Q.**   Okay.  So at that point, Mr. Mezzoiuso clearly knew

15  something was awry.  There was some investigation, or something

16  was suspicious; right?  He would have known something was

17  happening, at least in 2022?

18       **MS. SMUKLER:**  Objection.  Outside of this witness's

19  personal knowledge.

20       **THE COURT:**  Sustained.

21  **BY MR. FRIEDMAN:**

22  **Q.**   Are you aware of anything -- any contact law enforcement

23  had with my client that would make him aware of your

24  investigations?

25  **A.**   I'm not aware of that.

MILLER - CROSS / FRIEDMAN

**Q.** Okay. After the phone was seized and taken by Customs -- right? Was it taken by Customs?

**A.** Uh-huh. Yes, correct.

**Q.** Was there any further surveillance investigation on my client?

**A.** No.

**Q.** Nobody surveilled his home to see if minors were coming to his home?

**A.** No.

**Q.** Did you subpoena his phone records to see whether or not there were communications between him and people in other countries?

**A.** We did obtain his phone records, his tolls. I don't recall, off the top of my head, what those dates were.

**Q.** Did you subpoena any of his financial records to see whether or not he was sending monies in transfers to minors or people in other countries?

**A.** I did obtain his financials, yes, I did.

**Q.** Okay. Were there transfers of amounts going to other people in other countries?

**A.** No.

**Q.** Okay. The 17-year-old -- can you tell me her name?

     **MS. SMUKLER:** Objection, Your Honor.

     **THE COURT:** Sustained.

*///*

MILLER - CROSS / FRIEDMAN

1  BY MR. FRIEDMAN:

2  Q.   Can you tell me her initials?

3  A.   A.S.

4  Q.   Okay.  Has A.S. been charged in connection with any

5  underlying crimes?

6  A.   No.

7  Q.   Okay.  Has A.S. been used as a witness in other

8  prosecutions involving other people in the United States?

9        MS. SMUKLER:  Objection.  Relevance.

10        THE COURT:  Sustained.

11 BY MR. FRIEDMAN:

12 Q.   Were you aware that A.S., when she was 18, visited

13 Mr. Mezzoiuso at his home the night before he was arrested last

14 week?

15 A.   Again, Mr. Mezzoiuso did explain that to us in his

16 post-*Miranda* interview.

17 Q.   Were you aware of that?

18 A.   I was not aware of that.

19 Q.   Uh-huh.

20      Did you instruct A.S. to go to his house?

21 A.   I did not.

22 Q.   Uh-huh.

23      So as we sit here now, you really have no idea of the

24 relationship that they had as an adult, as A.S. was an adult,

25 and Mr. Mezzoiuso, do you?

MILLER - CROSS / FRIEDMAN

1   **A.**   I --

2           **MS. SMUKLER:**  Objection.  Relevance and asked and

3   answered.

4           **THE COURT:**  Sustained.

5       What's the relevance of that, Mr. Friedman?  If the charge

6   here is dealing with this victim A.S. when she was a minor,

7   what's the relevance of what happened after she turned 18?

8           **MR. FRIEDMAN:**  I'm trying to put this all in context,

9   Judge, because, at the end of the hearing, I'm going to make an

10  argument about dangerousness to the community.

11       And I want the Court just to have an understanding that

12  this wasn't a 13-, 14-year-old girl, as we see in a lot of

13  cases, but this was somebody who was very close to 18 and then

14  had a relationship while she was legal.  I just want the Court

15  to understand --

16          **THE COURT:**  Well, you can make that argument.

17       I'll sustain the objection.

18          **MR. FRIEDMAN:**  Sure.

19       Thank you, Judge.

20  **BY MR. FRIEDMAN:**

21  **Q.**   All right.  So getting back to the testing, that

22  Mr. Mezzoiuso was concerned about testing, did -- did A.S.

23  indicate that she was required to do testing before performing

24  oral sex back in July of 2020?

25  **A.**   No.

MILLER - CROSS / FRIEDMAN

1    **Q.**   Wouldn't you think it's kind of odd for somebody who's

2    texting about text -- getting tested for sexual transmitted

3    diseases would engage in sexual activity with somebody without

4    getting tested?

5              **MS. SMUKLER:**  Objection.  Relevance.

6              **THE COURT:**  Sustained.

7    **BY MR. FRIEDMAN:**

8    **Q.**   By the defendant texting A.S. when she was 17 and

9    requesting her to go to Atlanta -- meet him in Atlanta,

10   Georgia, to engage in sex, if that's what they were going to

11   do, is that a crime?

12   **A.**   No.

13   **Q.**   Okay.  By the defendant texting -- suggesting that he --

14   he'll come down to the Bahamas and they can meet in the Bahamas

15   when she was 17, nearing 18, is that a crime?

16   **A.**   No.

17   **Q.**   The counts in the indictment -- there was one count of

18   attempted coercion and enticement of a minor to engage in

19   sexual activity.  Is that based on the texting that the

20   Government's proffer to the Court was about, "when you can live

21   in my house"?

22   **A.**   Can you repeat the question?

23   **Q.**   The count in the indictment which charges attempted

24   coercion and enticement of a minor, Count 1 in this

25   indictment -- the underlying facts that support that is --

1  whether the underlying facts that support that -- if it's not

2  when he requested her to go to Atlanta and meet him, if it's

3  not when he requested or tried to make plans to go to the

4  Bahamas to meet her, what is the underlying facts supporting

5  Count 1?

6  **A.**  He asked her to -- he's asking her if they can have sex in

7  the Southern District of Florida when she's 17 years old.  He's

8  enticing her to have sex in the Southern District of Florida.

9  **Q.**  But he's --

10  **A.**  He's asking another person to join them for sex.

11  **Q.**  But isn't he asking her to have sex with him in Georgia,

12  not the Southern District of Florida?

13        **MS. SMUKLER:**  Objection.  This is asked and answered

14  and argumentative.

15        **THE COURT:**  I mean, this is argumentative, Counsel.

16  **BY MR. FRIEDMAN:**

17  **Q.**  Okay.  And --

18        **THE COURT:**  And I'll note that the grand jury has

19  returned an indictment, which is probable cause established in

20  this case.  So I think the Court can take notice of that.

21        **MR. FRIEDMAN:**  Sure.

22  **BY MR. FRIEDMAN:**

23  **Q.**  Count 2, with regard to the -- the attempt of -- the

24  attempt to transport a minor -- that's not back in July;

25  correct?  That's dealing with what happened from

1   September 23rd, 2020; correct?

2   **A.**   Correct.

3   **Q.**   Until October 16th, 2020?

4   **A.**   Correct.

5   **Q.**   And is there any evidence that he transported or sent a

6   car or a Lyft during that period of time, other than what A.S.

7   has told you?

8   **A.**   No.

9   **Q.**   Both counts are based on what A.S. has represented;

10  correct?

11  **A.**   Correct.

12  **Q.**   Uh-huh.

13       Is it --

14  **A.**   And her phone messages.

15  **Q.**   Is A.S. available?  Is she here in the United States --

16       **MS. SMUKLER:**  Objection.  Relevance.

17  **BY MR. FRIEDMAN:**

18  **Q.**   -- to testify?

19       **THE COURT:**  Sustained.

20  **BY MR. FRIEDMAN:**

21  **Q.**   Okay.  When Mr. Mezzoiuso was arrested, was he cooperative

22  with you?

23  **A.**   Yes.

24  **Q.**   Okay.  He didn't try to flee, do anything to conceal

25  himself; correct?

MILLER - REDIRECT / SMUKLER

1    **A.**   Correct.

2    **Q.**   Okay.  You've received no other complaints from any other

3    people, including minors, against my client; is that correct?

4    **A.**   Correct.

5    **Q.**   Uh-huh.

6         **MR. FRIEDMAN:**  I have nothing further, Your Honor.

7         **THE COURT:**  All right.  Thank you, Mr. Friedman.

8    Any questions, Ms. Smukler?

9         **MS. SMUKLER:**  Yes, just briefly, Judge.

10        **THE COURT:**  Go right ahead.

11                    <u>**REDIRECT EXAMINATION**</u>

12   **BY MS. SMUKLER:**

13   **Q.**   You were asked about whether there was corroboration that

14   the victim had traveled to the defendant's house.

15        Were there some text messages regarding the victim

16   referring to the location of the defendant's house and having

17   knowledge of where the house was?

18   **A.**   Yes.

19   **Q.**   Okay.  And you were also asked about the victim never

20   meeting with the defendant once she traveled back to the

21   United States in October of 2020.

22        How long was she in the United States before she was

23   placed in DCF custody?

24   **A.**   Three days.

25   **Q.**   Okay.  You were also asked if the defendant used Lyft or

1   any other transportation while she was in the U.S.

2        During the text message conversation, did the defendant

3   ask for the victim's information so he could book her travel to

4   the United States?

5   **A.**   Yes.

6   **Q.**   Okay.  You were also asked several questions about

7   whether, if the defendant traveled to the Bahamas, it would be

8   legal for him to have sex with the minor.

9        Just to be clear, if the defendant was traveling with the

10  intent -- intent to pay the minor to engage in a commercial sex

11  act with the minor, would that be legal?

12        **MR. FRIEDMAN:**  Judge, I'm going to object.  It's --

13  it's -- it's irrelevant.  The client is not charged in this

14  particular indictment with commercial sex activities and paying

15  for that.

16        **THE COURT:**  All right.  I'll overrule that.  I think

17  it's proper cross.

18        **THE WITNESS:**  It's illegal.

19  **BY MS. SMUKLER:**

20  **Q.**   Okay.  And during this period of July of 2020, when the

21  victim was in the United States, were you able to find that --

22  that's the period before the conduct charged in the indictment.

23  Were there text messages, either on the victim's phone or the

24  defendant's phone, that you could read or were accessible to

25  you?

1  **A.**  The -- the phone extraction from the victim's phone was

2  deleted during that time frame.  A review of Mr. Mezzoiuso's

3  phone revealed the same.  Any text messages were deleted during

4  that time frame.

5  **Q.**  Okay.  And just -- the last question.  Just so it's clear,

6  you were asked about surveillance.

7      No surveillance was conducted, but was there surveillance

8  done just before his arrest, just for purposes of arresting the

9  defendant?

10  **A.**  Yes.

11          **MS. SMUKLER:**  Okay.  No further questions.  Thank you.

12          **THE COURT:**  All right.  Thank you, Ms. Smukler.

13      All right.  Agent Miller, you can step down.

14      All right.  Any other evidence from the Government?

15          **MS. SMUKLER:**  Just argument, Your Honor.

16          **THE COURT:**  All right.  Any other evidence from the

17  defense?

18          **MR. FRIEDMAN:**  Yes, Judge.  I'd like to call my

19  client's cousin.

20          **THE COURT:**  In reference to what?

21          **MR. FRIEDMAN:**  With regard to risk of flight,

22  Your Honor.

23          **THE COURT:**  Can you proffer what he would testify to?

24          **MR. FRIEDMAN:**  Give me one second, Your Honor.

25      Judge, what he would testify to -- and if the Court could

```
 1    just take notice that his family members are sitting in the
 2    back of the courtroom.
 3         His cousin is Joseph Arena.  He's a physician here in
 4    South Florida.  He's been here for quite a long time.  He's
 5    sort of a staple in the Deerfield Beach/Lighthouse Point area
 6    and practices internal medicine and a well-respected physician
 7    in South Florida.
 8         This is his cousin.
 9              THE COURT:  Okay.
10              MR. FRIEDMAN:  He would testify that he resides within
11    a mile of the defendant's home, that he owns his home.  He
12    would testify that he would be willing to cosign any bond.
13    Dr. Arena owns a home.  The home, I believe, is valued at
14    approximately $3 million.  He lives in Lighthouse Point.
15         My client -- so he would testify to those things.  He
16    would testify just to his overall activities because they are
17    so close that -- he is recently retired, you know, goes out to
18    dinner.  They frequently, you know, socialize here and there.
19    He works on his home.  He would talk about those things as
20    well.
21         He would also talk about potentially -- he is -- well,
22    he's a physician.  He -- he does, I think, treat him as -- as
23    his physician and that possibly there may be some issues with
24    his health that the Court may want to be aware of.
25         But those are the things that he would testify to.  He's
```

1  known him in the family for over 50 years.  They are cousins.

2  And he would talk about his ties to this community, my client's

3  ties, having been here since he was a little -- a kid.  He's

4  been a U.S. citizen, I think, since he was 12 years old and --

5  those matters, Judge.

6       **THE COURT:**  All right.  I mean, I would be willing to

7  accept that proffer.  If you want to put on the doctor, you

8  can, but I'd be willing to accept the proffer.

9       **MR. FRIEDMAN:**  Okay.  Then I'll -- I'll not put him

10 on, but --

11      **THE COURT:**  Okay.

12      **MR. FRIEDMAN:**  -- he's able and willing to testify.

13 If the Court has any questions outside of, you know, anything

14 that I've discussed or requested, he's more than available --

15 more than willing to -- to provide that information.

16      **THE COURT:**  All right.

17      **MR. FRIEDMAN:**  All right.  Also present, Judge, in the

18 courtroom is Rose Marie Nelly, his sister, and Anne Ilardi, his

19 other cousin, which is Joseph's sister.  And they are all here

20 for support.

21      The pretrial report --

22      **THE COURT:**  All right.  I understand.

23      So you have no more evidence other than that?

24      **MR. FRIEDMAN:**  No more evidence, Judge.

25      **THE COURT:**  All right.  So why don't we go to -- to

1    argument, then.  I'll hear -- I'll hear from you, and then I'll

2    hear from the prosecutor.

3              **MR. FRIEDMAN:**  Sure.

4         Judge, we believe that a bond is appropriate in this case.

5    I understand the -- the presumptions, but they are rebuttable

6    presumptions.

7         I'd ask the Court to take judicial -- and the Court has

8    already taken judicial notice of the Pretrial Services report.

9    And on the third page, where it talks about assessment of

10   nonappearance, the report states there are no known factors

11   indicating the defendant poses a risk of nonappearance.  And I

12   would suggest that is 100 percent accurate.  There are

13   absolutely none.

14        My client has no record whatsoever.  He is a U.S. citizen.

15   There is no evidence that he's ever failed to appear for much

16   less a traffic ticket, if he -- if he's even had one in his --

17   in his life.

18        So as far as nonappearance -- plus, the fact -- I would

19   point out to the Court that he --

20             **THE COURT:**  Let me ask you this.

21        What about the fact that he's 65 and, if he's convicted,

22   he's facing a ten-year mandatory minimum sentence?

23             **MR. FRIEDMAN:**  I understand that.  I understand that

24   completely, but at this point, he's presumed innocent.

25        There seems to be -- and I didn't get into a full-blown

1   cross-examination of the agent in this case, but there are

2   questions of whether or not my client, Number 1, engaged in any

3   sexual activity with this A.S. while she was a minor, while she

4   was 17.

5        There are some serious questions as to that, based on the

6   circumstances of the texting that's going on and what he --

7   when he required that they be tested.  And then, you know, she

8   comes before any communications whatsoever have taken place,

9   and she's alleging that she engaged in sexual activity with

10  him.

11       It's interesting because A.S. can't identify him.  The

12  agent --

13            THE COURT:  Why else would -- why else would your

14  client have an Uber pick her up and bring her to his house?

15            MR. FRIEDMAN:  I don't know, Judge.  There's --

16  there's different reasons.  I don't know, but I'd say --

17            THE COURT:  But why -- why would a

18  60-something-year-old man have a 17-year-old minor picked up by

19  Uber and brought to his house and brought back the next morning

20  from his house back to her place?

21            MR. FRIEDMAN:  Maybe --

22            THE COURT:  I mean, what other inference is there?

23            MR. FRIEDMAN:  Maybe they just spoke.

24            THE COURT:  In light of the text messages and in light

25  of the other situation -- the other evidence, what other

1   inference is there other than that was to have sex?

2      **MR. FRIEDMAN:**  Well, there's also the inference that

3   maybe they just spoke and communicated about maybe having a

4   relationship down the road, and that's quite -- that's entirely

5   legitimate.  I'm just saying I -- not personally, but I've

6   heard of situations where men call escorts, they come, and they

7   don't engage in any sexual activity.  They talk.

8      And I know you've haven't had an opportunity to review the

9   hundreds of pages of text-messaging, but, you know, when you --

10  when you review it all, it makes sense, if you put it all in

11  context.  So there's other -- there is another legitimate

12  reason other than to have sex.

13     The moment -- the times where it's discussed about having

14  sex, I would point out that he suggests Georgia, which is

15  apparently legal to have sex with a 17-year-old.  So by him

16  suggesting that "We can meet in Atlanta, Georgia," suggests

17  that he doesn't want to violate the laws in Florida, where, you

18  know, they have to be 18 years old.  But he's trying to find

19  another location.

20     Now, whether, morally, you know, you believe that somebody

21  over the age of 18 shouldn't be with somebody under the age of

22  18 is one thing.  But if somebody is trying to figure out where

23  they can legally engage in sexual activity, Judge, that's --

24  that's just -- there's no crime there.

25     If he is suggesting, "I will come to the Bahamas," which

1  he did during a portion of the text communications, he's trying

2  to figure out, "Where can I at least meet you and maybe have

3  sex?"  But it's not a crime.

4      And I know that's a crazy argument, but it's almost like,

5  you know -- you know, it's like somebody paying taxes.  You

6  know, let's take advantage of every tax loophole there is, and

7  there's nothing illegal about it.

8          **THE COURT:**  But how do you explain what was on his

9  phone, where he's talking about having contact with

10  14-year-olds and 15-year-olds --

11          **MR. FRIEDMAN:**  He's never --

12          **THE COURT:**  -- and all of that?

13          **MR. FRIEDMAN:**  He never admitted to having contact

14  with any of those people.  He's suggesting, "We may" -- "maybe

15  we can get a 14-year-old or a 16-year-old," but he never says,

16  "I've had sex with a 14-year-old" or "I've had sex with a

17  16-year-old."  I didn't see that.

18          **THE COURT:**  What else -- what else would he be doing

19  if he wants to contact a 14- or 15-year-old?

20          **MR. FRIEDMAN:**  I don't know, but it's all speculation

21  at this point.  He's presumed innocent.  And him suggesting,

22  you know, having sex in these other locations, which apparently

23  is legal, the Court should take that into consideration.

24          **THE COURT:**  No.  And I -- and I understand.

25          **MR. FRIEDMAN:**  Yeah.

```
1          THE COURT:  And he is presumed innocent, and the

2   Bail Reform Act, you know, acknowledges that.  What my concern

3   is, is the danger to other people in the community.

4       I mean, we have the evidence here, where the grand jury

5   has found probable cause for his enticement charges.  And then

6   on his phone, he's talking about, with more than one

7   individual, trying to meet up with -- with children who are 14

8   or 15 years old.

9          MR. FRIEDMAN:  That's -- that's not accurate, Judge.

10  I know -- I don't know if -- you haven't seen all the --

11  there's hundreds of pages in it.  Now, unfortunately, I've only

12  had a short --

13         THE COURT:  What's accurate?  In other words, what was

14  he doing when he was apparently texting another person about

15  getting a 14- or 15-year-old?

16         MR. FRIEDMAN:  It was -- it was spoken about almost

17  as -- as a fantasy, as "something possibly we can do," but it

18  wasn't like "We're going to get this minor, where I've done

19  this before."  That's what I'm saying, Your Honor.

20         THE COURT:  I understand.

21      Okay.  I understand.  I understand your argument.

22         MR. FRIEDMAN:  And as far as the -- and as far as the

23  dangerousness to the community, this gentleman was identified

24  by law enforcement, going back to 2020, where they knew who he

25  was.  They received text-messaging -- at least statements from
```

 1    A.S., and nothing has happened.

 2         It's been over three years, more so that he came back from

 3    a cruise that he went on in 2022.  After they'd seized his

 4    phone, he hasn't done anything to, you know, thwart the system,

 5    conceal himself, leave the country, any of those things.

 6         And there's no evidence -- and I asked the agent whether,

 7    you know, there's been other minors or any other evidence to

 8    suggest that he's been with minors.  And the answer was "No."

 9         So as far as him being a danger to the community,

10    Your Honor, I -- I understand the charge has a rebuttable

11    presumption because of the nature of the charge.  And that

12    carries, with it, this presumption.

13         But I think the Court can consider all the circumstances

14    in this case and that we're talking about one particular

15    17-year-old girl who -- it's questionable whether they engaged

16    in sex on that one occasion.  And then, subsequent to that, all

17    Mr. Mezzoiuso is trying to do is question when she's going to

18    come back but offers other locations where it can be legal.

19         So if it's legal in Georgia, and if that's the case -- and

20    that's what the agent testified to -- he's not dangerous, I

21    guess, in Georgia -- or he's not a danger to the community in

22    Georgia.  If it's -- if it's legal in the Bahamas, he's not

23    dangerous in the Bahamas.

24         I don't believe he's a danger factually, based on his

25    background, his history, who he is, his family background, his

1    ties to this community, his -- his -- essentially a danger, as

2    we want to believe, you know, as that -- as that term should be

3    defined.

4         He's willing to sign his name, obviously.  He owns a

5    house.  The Pretrial Services report indicates that his house

6    is owned.  He owns it free and clear.  And on top of that, like

7    I mentioned, his cousin owns a very large real estate, and he

8    is willing to cosign, which I think sends a very strong message

9    to the Court that his own family, his own family, do not

10   believe that he is this danger to the community.

11        And if he was a danger at any time back in 2020, he's not

12   been a danger since, since, and we're talking three years.  And

13   that also goes to the issue of flight risk, Judge, and I

14   really -- I -- I don't see him being a flight risk, especially

15   if his cousin is willing to cosign on a bond.

16        And I explained to him what that means, and he is more

17   than willing to do that and has full confidence that, you know,

18   his cousin will retain counsel and will -- and will fight this

19   case, you know?  And wherever it ends, it ends.  But there are

20   issues in this case as to whether or not some of these

21   assertions are actually true.

22        And that's -- that's my argument, Judge.  So I'm

23   requesting that you set a bond.  There's conditions and,

24   obviously, a combination of conditions that could assure the

25   dangerness [sic] issue, if that's -- if that's a concern, such

 1   as restrict him from having any access to his cell phone, from

 2   having any access to the Internet completely, 100 percent

 3   completely.

 4        These -- the -- the -- the indictment that they are

 5   charging, that one count (Inaudible) limited period of time,

 6   happened over using a phone.  So his -- his phone -- he can --

 7   you can restrict that.  And those are conditions that would

 8   assure the safety of the community, clearly, electronic

 9   monitoring as well for his -- you know, maintaining his being

10   in the house.

11        He's retired.  He -- he can stay in his house.  He's not

12   going to be going out to work.  You saw his Pretrial Services

13   report.  He gets social security income.  He does have assets.

14   He has a rental property in Missouri.  So he does have

15   sufficient monies to sit in his house, as much as he can sit in

16   a jail cell, during the period that this case, you know, takes

17   to resolve itself.

18        So --

19          **THE COURT:**  All right.  Thank you, Mr. Friedman.

20        All right.  Ms. Smukler, any -- any argument?

21          **MS. SMUKLER:**  Yes, Your Honor.

22        Your Honor, as has been mentioned several times, there is

23   a rebuttable presumption under 3142(e)(3)(E) that no condition

24   of release, or no combination of conditions, will reasonably

25   assure this defendant's presence or the safety of the

1   community.

2        Here, if the Court were to impose even strict home

3   detention conditions, that could not assure the safety of the

4   community, as the Court would be sending the defendant back to

5   the scene of the crime itself, back to the home where he was

6   text-messaging minors, asking about traveling with minors, and

7   talking about sex with minors.

8        Moreover, just to specifically talk about an enforcement

9   on a ban of computers or Internet, I have spoken with Probation

10  about that, and I just -- I would like to address that that

11  would be very difficult.  The Probation Office cannot

12  completely prevent the defendant from using the Internet or

13  using a phone.

14       And I actually found a case, *United States v. Emmons*.

15  It's 294 F. App'x 848.  It's a Fifth Circuit case in 2008

16  finding that the District Court properly detained a -- or

17  properly detained and found that -- that the presumption

18  applied in the case.

19       And the Fifth Circuit noted that the District Court ruled

20  that, in that case, Emmons could not rebut the presumption,

21  based on its finding that the Probation Office could not

22  prevent Emmons from accessing another contact -- a computer to

23  contact a minor.

24       Now, the defense points to the fact that Probation said

25  that there is no risk of nonappearance.  The Government would

disagree with that, based on the defendant's messages with

females abroad in both Lithuania and Pan- -- Panama, and not

just his conversations with females abroad but specifically the

nature of the conversations.

In his conversation with the female from Panama, he says

that he -- he talks about Brazil, Colombia, Bolivia, Ecuador,

Paraguay, and Peru and talks about where it is legal, or where

he believes it's legal, for -- to have sex with -- with

individuals where he says the individuals can be 14 years old.

In his text message with the female who is located in

Lithuania, he says, "Maybe we can travel together to a country

where the legal age is younger."  When that female states that

she doesn't want to have sex with a 16-year-old because they

don't know how to have sex, he states, "We can teach them."

So this defendant has expressed an interest in traveling

abroad to have sex with minors.  And so the Government is

concerned, based on his clear ability to travel and clear

interest in traveling to have sex with minors, that he does

pose a risk of flight.

And I'll address also his sentence in a minute -- his

potential sentence.  I'm sorry.

In terms of danger, Probation has pointed out that they

believe the defendant poses a risk of danger.  I know the

defense talks about the context of the messages, and I would

proffer to the Court that the context of the messages with the

1  victim in this case are mostly sexual.

2      I mean, I was -- actually had found a quote from the

3  messages -- it's on Page 89 of 128 -- that I provided to

4  defense counsel, so more than halfway through, where he's

5  talking about sex and having a threesome.  And the victim says,

6  "Just talk" -- "stop talking about it and get to know me."

7      So this isn't the type of text messages where it's a

8  relationship and they're talking about their day or they're

9  talking about their dreams and hopes.  They're talking about

10 the victim traveling to the United States to have sex or this

11 defendant traveling to the Bahamas to have sex or the victim

12 traveling to a state where it is or is not legal to have sex.

13 So that is the context of the text messages in this case.

14     As Your Honor knows, in determining where there -- whether

15 there are conditions of release, you can consider the nature

16 and circumstances of the offense, the weight of the evidence,

17 the history and characteristics of the defendant, the nature

18 and seriousness of the danger that would be imposed.

19     Here, the weight of the evidence is strong.  First, as

20 Your Honor has mentioned, this case is already indicted by the

21 grand jury, and so probable cause has been found.

22     But in addition, the defendant's own messages -- it's his

23 own words that are the evidence in this case, and which he has

24 admitted are his words, and that proves that he's a present

25 danger to the community, not just to the minor victim in these

 1   messages but, as I mentioned, to other minor victims.  He talks

 2   about kids as young as 14 years old and having an interest in

 3   kids that are 14 years old or 16 years old in other countries.

 4        The severity of the sentence in this case weighs in favor

 5   of detention.  As Your Honor mentioned, he meant -- he faces a

 6   maximum sentence of life but mandatory sentences of ten years

 7   for each count charged in the indictment.  And given the

 8   sentence -- this defendant's age, a ten-year sentence is -- is

 9   very substantial and severe and weighs in favor of detaining

10   this defendant.

11        The defendant has shown an interest in more than just the

12   minor victim he's charged with enticing in this case.  He has

13   expressed an interest in traveling to have sex with minors on

14   multiple occasions.

15        And as I said, the discussions of travel not only raise

16   concern of the defendant's ability to flee or desire to go to

17   other countries but, certainly, that he's a danger not just to

18   this minor victim, who he may or may not want to have a

19   relationship with after she turns 18 -- and just so the Court

20   is clear, she had just turned 17 when -- when these messages

21   occurred -- but he has shown an interest in minors.

22        And that -- the Court can't protect minors when the

23   defendant is at his home and has the ability to access the

24   phone and the computer, just like -- as he did in this case.

25        So for those reasons, we would argue that he is a risk of

```
1   flight and danger to the community and that the defense has not

2   rebutted the presumption.

3            THE COURT:  All right.  Thank you, Counsel.

4         MR. FRIEDMAN:  Judge, just real briefly.

5      I should have mentioned, I have my client's passport.  His

6   cousin brought it.  If you look at it, there's -- there's no

7   actual stamps to any of the countries that are suggested that

8   my client would fly to.  It's -- you can see it, and I'm

9   willing -- we're -- we're ready to surrender it to the Court,

10  Judge.

11           THE COURT:  All right.  Anything else?

12        MR. FRIEDMAN:  One moment.

13     Judge, the only thing I -- again, I'd -- I'm probably

14  repeating myself -- is that it's been three years, three years,

15  and my client has not done anything in those three years.

16  There's no evidence to suggest, or suspicion, that he's reached

17  out, attempted to travel, engage in any of the same conduct

18  that the Government's alleging in the -- in the indictment in

19  almost three years.

20        And I think that, in and of itself, Judge, should

21  overweigh -- outweigh this presumption of dangerousness, that

22  coupled with all the other conditions the Court can impose on

23  him, which -- he would have absolutely no communications with

24  anybody, including minors.

25           THE COURT:  All right.  Thank you.
```

```
 1          And, Ms. Smukler, let me ask you one question.  What was

 2     the date when he returned on the cruise and his phone was --

 3     was taken?

 4               MS. SMUKLER:  February of 2022.

 5               THE COURT:  February of 2022.  Okay.

 6               MR. FRIEDMAN:  Judge, can you give -- one second.  I

 7     just -- his cousin is --

 8               THE COURT:  Okay.

 9               MR. FRIEDMAN:  -- asking me a question.

10               THE COURT:  Sure.

11               MR. FRIEDMAN:  Your Honor --

12               THE COURT:  Yes, Mr. Friedman.

13               MR. FRIEDMAN:  -- may I --

14               THE COURT:  Use the microphone.

15               MR. FRIEDMAN:  May I call his cousin just for perhaps

16     one minute just to explain circumstances that have occurred

17     within -- since the three -- since this incident allegedly

18     occurred to the present?

19          And perhaps it would fill in some of the -- the doubt or

20     curiosity that the Court may have about my client.

21               THE COURT:  All right.  If you want to call your --

22     your -- the cousin, go right ahead.  Have him come up to the

23     stand.

24               COURT SECURITY OFFICER:  Here.  Right here.

25               THE COURT:  Well, why don't you have a seat up here on
```

ARENA - DIRECT / FRIEDMAN

1    the stand.

2           THE WITNESS:  Okay.

3           THE COURT:  We'll -- we'll swear him in.

4           THE CLERK:  Please raise your right hand.

5       You do solemnly swear that the statements you're about to

6    make will be the truth, the whole truth, and nothing but the

7    truth?

8           THE WITNESS:  Yes.

9           THE CLERK:  Thank you.

10           THE COURT:  And state your name for the record,

11   please.

12           THE WITNESS:  Dr. Joseph Arena, A-r-e-n-a.

13           THE COURT:  All right.  Go right -- and your

14   relationship to Mr. Mezzoiuso is what?

15           THE WITNESS:  He's my first cousin.

16           THE COURT:  All right.  Go ahead, Counsel.

17           MR. FRIEDMAN:  Thank you.

18                          <u>JOSEPH ARENA</u>,

19   called as a witness for the Defendant, having been duly sworn,

20   testified as follows:

21                       <u>DIRECT EXAMINATION</u>

22   BY MR. FRIEDMAN:

23   Q.   Dr. Arena, you've sat through this detention hearing;

24   correct?

25   A.   Correct.

ARENA - DIRECT / FRIEDMAN

1   **Q.**   You've heard everything that's been said?

2   **A.**   Correct.

3   **Q.**   You want to address the Court.  I know you said there was

4   something you wanted to tell the Court regarding your cousin,

5   obviously, since the allegations -- since the date of the

6   allegations almost three years ago.

7   **A.**   Thank you, Your Honor.

8        It is my opinion -- first of all, he is my cousin.  We're

9   a kindred spirit.  I know his inner sanctum.  I know this man.

10  This is a fall from grace.  These text messages are disgraceful

11  to him, and that's what he said to me from the jail.

12       Let me point out that I have had many a party at my home,

13  including the Super Bowl, February 12th.  My office manager has

14  two very lovely teenage -- one is a teenager.  The other one, I

15  think, just turned 20.  They are very pretty girls.  They're

16  very nice girls.

17       We had a bunch of young girls at this party.  I have never

18  heard this man say to me, previously or after, "I want to speak

19  to young girls."  I would put my life, my reputation, my home

20  on the line for him.

21       This is a fall from grace.  He is disgraced.  These are

22  his words.  He is severely embarrassed.  His parents in Heaven,

23  who he took care of -- his father, who was dying after four

24  strokes -- he cleaned him front and back, top and bottom.  He

25  toileted him.  His mother -- he insisted that she remain on

**ARENA - DIRECT / FRIEDMAN**

 1  hospice at his house.

 2       He can't live without his family.  There is no traveling.

 3  There will be no leaving the country.  There will be no leaving

 4  anything.  He can live with me.  But this man fell from grace.

 5  He has helped me when I fought in the custody battle for my

 6  son, who I love, my life.  Everyone loves him.

 7       He fell from grace.  This shall never happen again.  It

 8  never happened before.  We've been on other trips together.

 9  He's been around many a young woman, and he tells me he's

10  attracted to women in their 20's.

11       And I tell him, "We should start going out and finding

12  women that are in their 30's and 40's that are still quite

13  attractive.  Let's get on with it."  And this conversation

14  happened Thursday night.

15       He goes, "You know, Joe, I have to start thinking about

16  that because I'm getting older."

17       This is a fall from grace.  He is not a criminal.

18            **THE COURT:**  All right.  Thank you.

19       Any other questions?

20            **MR. FRIEDMAN:**  No, Judge.

21            **THE COURT:**  All right.  Any -- any questions from the

22  Government?

23            **MS. SMUKLER:**  No.

24            **THE COURT:**  All right.  Thank you, Doctor.  You can

25  step down.

1              THE WITNESS:  Thank you.

2              THE COURT:  All right.  Anything else from either

3    side?

4              MS. SMUKLER:  Judge, I just want to be very clear for

5    the record.

6         Defense keeps talking about three years.  The victim in

7    this case was encountered in October 2020.  The -- the -- her

8    conversations about this defendant were in December 2020.  So

9    it's been two years and three months since she first disclosed

10   this defendant's involvement.

11        So just --

12             THE COURT:  All right.

13             MS. SMUKLER:  -- just to be clear.

14             THE COURT:  Understood.

15        Anything else?

16             MR. FRIEDMAN:  No, Judge.

17             THE COURT:  All right.  Thank you.

18        All right.  So, you know, I have reviewed everything here,

19   and this is a -- obviously a serious case.  The Government's

20   moving for pretrial detention in this case.  I always take

21   these matters seriously because I want to make sure I do the

22   right thing to assure the defendant's presence and protect the

23   community and also to acknowledge the defendant's presumption

24   of innocence.

25        In this case, the Government's moving for pretrial

1    detention on both serious risk of flight, and in the statutory

2    basis, and arguing that he is a danger to the community.

3        As far as the -- as far as the serious risk of flight

4    prong, in looking at that, that is a rebuttable presumption.

5    And in this case, I've heard from the defendant's cousin,

6    Dr. Arena, and reviewed the Pretrial Services report.

7        He is a U.S. citizen.  He doesn't have any priors in this

8    case, and he does own his own home, and he's a resident of the

9    Southern District of Florida.  Now, those are all in his favor.

10       Against him would be the fact that he's facing a lengthy

11   prison term, if convicted.  He's facing at least a ten-year

12   mandatory minimum prison term, and he's 65, which would put him

13   into his mid-70's if he were convicted and got the mandatory

14   minimum sentence.

15       And I did note, in the Pretrial Services report, that the

16   Pretrial Services officer indicates that there's no known

17   factors indicating the defendant poses a risk of nonappearance.

18       I do note the Government's argument -- Ms. Smukler's

19   argument that, you know, he intended to travel to these foreign

20   countries or at least expressed a desire to travel to these

21   foreign countries.

22       When I consider everything in this case, I -- I am going

23   to find the defendant has successfully rebutted the presumption

24   on the serious risk of flight ground.  I think that there are

25   conditions of release that would assure his appearance in

 1   court.

 2        So I'm certainly -- I'm not going to detain the defendant,

 3   or order detention, on serious risk of flight grounds.  I think

 4   there are conditions of release that would reasonably assure

 5   his presence in court.

 6        Now, in going to the -- the -- the danger and the other --

 7   the other basis for the Government's detention request, in this

 8   case, there is a -- under -- under (f)(1)(E), this case does

 9   qualify for the Government moving for pretrial detention

10   because it involves a -- a minor victim.

11        And when I -- when I look at the allegations in the case,

12   I have to go to the 3142(g) factors, which the Court is

13   required to -- to consider, in determining whether there are

14   conditions of release that would reasonably assure the safety

15   of any other person and the community.

16        The first factor is the nature and circumstances of the

17   offense charged or offenses charged and whether or not it

18   involves a minor victim.  In this case, the offenses charged

19   are extremely serious, and they do involve a minor victim.  And

20   so under -- under (g)(1), that factor weighs against the

21   release of the defendant and in favor of detention.

22        The second factor is the weight of the evidence against

23   the person.  At this point, we have a grand jury who's returned

24   an indictment and has found probable cause.  There are numerous

25   text messages, and from -- from what I can gather, there

1   appears to be substantial circumstantial evidence, which shows

2   that this minor was -- was transported to and from his

3   residence and was paid money at one point to engage in -- in a

4   sex act.

5       So I think the weight of the evidence against the

6   defendant is strong, and that factor weighs against the

7   defendant and in favor of the detention -- in favor of the

8   Government on detention.

9       Under (g)(3), the history and characteristics of the

10  defendant, I think the -- the history and characteristics of

11  the -- of the defendant, the fact that he has no priors -- he

12  does have family support.  He doesn't appear to have any

13  alcohol abuse or drug abuse issues.  He does seem to have

14  strong community ties.

15      I think, in general, the persons -- his -- his ties to the

16  community and his -- and his family support weighs in favor of

17  the -- of the defendant.  That would be under (3) -- (3)(A).

18  And the fact that he has no -- no criminal history also

19  weighs -- weighs in his favor.

20      Under (3)(B), under Section (g) of Title 18, United States

21  Code, 3142, he was not on any -- any probation or parole at --

22  at the time of this offense.  So that also weighs in the

23  defendant's favor.

24      Now, under (g)(4), the nature and seriousness of the

25  danger to any other person or the community that would be posed

1    by the person's release, I am concerned about this, and I've

2    been considering this very carefully as the hearing has been

3    going on.

4         And what really does make me quite concerned -- it's not

5    just the interactions with this minor victim.  It's what was

6    found on the telephone when -- just last year, when he returned

7    from his cruise.  And he's obviously expressing a desire for

8    minor children, to be with minor children.

9         I mean, I don't see any other way that a legitimate

10   argument can be made other than that.  Why else would a

11   60-something-year-old man, 64-year-old man, 65-year-old man

12   want to be with a 14-year- -- meet a 14-year-old, meet a

13   15-year-old, anything of that nature?

14        And the phone -- the phone extraction from most recently

15   in February of '22, when he returned on his cruise -- that

16   does -- that does trouble me because it indicates to the Court

17   that this is not just a one-time thing, where he was involved

18   with this 17-year-old from Jamaica.

19        But it's something that he thinks about quite a bit and

20   has been thinking about and has contact with other individuals

21   wanting to -- to -- to have involvement with -- with minor --

22   with minor children.

23        And so the nature of the instant offense is quite serious.

24   This charge involves -- involves a sex offense or -- or abuse

25   of a minor, and I am -- I am concerned about the safety

1   concerns for the community or any specific individual in the

2   community.

3       And I do note that -- I know that defense counsel -- and

4   you've done a very good job, Mr. Friedman.  I know you've

5   pointed out that the Pretrial Services report does not have

6   any -- does not indicate there are any factors indicating that

7   the defendant poses a risk of nonappearance.  It does indicate

8   that the defendant poses a risk of danger, and -- and the

9   probation -- the Pretrial Services report does recommend

10  detention of the defendant.

11      So when I consider everything, and I -- and I really look

12  carefully at the evidence, and I look at that -- what was on

13  the phone when he came back from his cruise, it does appear to

14  the Court that he has -- there's evidence and information of

15  him having a fixation on -- on minors.

16      I think those phone contacts were clearly indications that

17  he wished or intended or desired to have sex with minors, and

18  it's very concern -- concerning on what was on his cell phone

19  when I combine that with what his involvement was with the

20  17-year-old in this case.

21      So when I consider everything in this case, I do find the

22  defendant has not rebutted the danger to the community prong,

23  and I am going to order the defendant held on pretrial

24  detention with no bond, as a danger to the -- as a danger to

25  the community, for all those reasons I stated and for all the

1    reasons I'll put in my pretrial detention order.

2         I understand that the defense has made a strong argument

3    here, and I've carefully considered it.  But I do think that

4    those -- those additional phone conversations -- or those

5    additional texts on the phone in 2022 put the case over -- put

6    the case over the edge.  I really do.  This is not just a

7    one-time thing, from what those phone involvement -- from what

8    those phone -- text messages indicate.

9         And this offense itself -- these two offenses are

10   seriousness -- serious enough on their own.  But when you add

11   in those -- those additional matters that were on his phone

12   when he came back from the cruise, I think that puts -- puts me

13   over the -- over the edge to find that the defendant has not --

14   has not met his burden to -- has not rebutted -- I won't say

15   "met his burden."

16        I will say that he has not rebutted the presumption

17   sufficiently, Number 1, and, Number 2, that the Government has

18   proven, by clear and convincing evidence, that the defendant is

19   a danger to the community or any other person in the community

20   and that there are no conditions or combinations of conditions

21   of release that will reasonably assure the safety of the

22   community or people in the community, especially minors in the

23   community.

24        So I'm denying the Government's request for detention on

25   serious risk of flight grounds.  I am granting the Government's

```
1   request for detention on danger grounds and on the statutory

2   basis of the offense and after considering all the 3142(g)

3   factors.

4       So I will go ahead and enter a written pretrial detention

5   order in this case and --

6           MR. FRIEDMAN:  Your Honor --

7           THE COURT:  -- go from there.

8       Yes, Mr. Friedman.

9           MR. FRIEDMAN:  It -- just for purposes of the Court's

10  ruling and if there's going to be a review of that, is the

11  Court finding that the minors that were alluded to in these

12  text messages that were found on my client's phone after he

13  returned from the cruise in 2022 -- if these were

14  communications to have minors involved in any type of sexual

15  activity but was in a location -- geographical area that was

16  legal, would that change the Court's thought process in this

17  case?

18          THE COURT:  Well, I would always consider that, but I

19  think what it shows to me is, in addition to what he's charged

20  with here, having a fixation on a 17-year-old, he's got a

21  fixation on other minors.

22      And so, you know, he's in this community now.  So whether

23  or not he had a fixation on a minor that might be legal in a

24  foreign country or might not be, he's got a fixation on minors.

25      And I don't think there's any way that I can guarantee or
```

```
 1   reasonably assure that he's not going to be a danger to minors
 2   in this community, based on what I've seen from this indictment
 3   and what I've heard was on his cell phone, because it seems to
 4   the Court that, for whatever reason, this 65-year-old man has a
 5   fixation on children who are under 18.
 6         And whether, in certain states or certain countries, it
 7   may or may not be legal to have sex with a 14-year-old or a
 8   16-year-old or a 17-year-old or 18-year-old, the fact of the
 9   matter is that, in Florida and under federal law, the age of --
10   is 18.
11         And if he were to have sex with anybody or attempt to
12   entice anybody under 18 here in Florida, especially for
13   payment, it would be illegal.
14         So in answer to your question, I think it just shows a
15   predilection of this defendant for minors, and that's what
16   concerns me.
17               MR. FRIEDMAN:  Thank you, Judge.
18               MS. SMUKLER:  Your Honor, would you consider ordering
19   the defendant that he may not have any contact with the victim
20   while in custody or indirectly through family?
21               THE COURT:  Yes, I -- I will.
22         I'm going to order that -- unless the -- unless the victim
23   wants to have contact with him, and that can be established to
24   me that she's making a knowing decision, I'm going to order
25   that the defendant can have no contact with the victim -- I
```

1    think the initials are A.S.

2              **MS. SMUKLER:**  That's correct.

3         Thank you, Your Honor.

4              **THE COURT:**  -- of any -- of any type, either directly

5    or indirectly.

6              **MS. SMUKLER:**  Thank you, Your Honor.

7              **THE COURT:**  All right.  The hearing is -- is concluded

8    in this case.

9         I hope everybody has a good afternoon.

10             **MS. SMUKLER:**  Thank you.

11             **THE CLERK:**  All rise.

12        Court is in recess.

13                  (Proceedings adjourned at 12:27 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **<u>CERTIFICATE OF TRANSCRIBER</u>**

4           I certify that the foregoing is a true and correct

5    transcript, to the best of my ability, of the above pages of

6    the official electronic sound recording provided to me by the

7    U.S. District Court, Southern District of Florida, of the

8    proceedings taken on the date and time previously stated in the

9    above matter.

10          I further certify that I am neither counsel for,

11   related to, nor employed by any of the parties to the action in

12   which this hearing was taken, and further that I am not

13   financially nor otherwise interested in the outcome of the

14   action.

15

16   DATE:  Friday, March 17, 2023

17

18

19

20           <u>        /S/ James C. Pence-Aviles        </u>

21        James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                        U.S. Court Reporter
22

23

24

25