# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 23-cr-80034-KAM

**UNITED STATES OF AMERICA,**

**vs.**

**ARISTIDE MEZZOIUSO,**

**Defendant.**

_____/

## <u>UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER</u>

Defendant Aristide Mezzoiuso ("Mezzoiuso" or "Defendant") has filed a motion requesting that this Court revoke the Pretrial Detention Order entered on March 13, 2023 and hold a *de novo* evidentiary hearing (the "Defendant's Motion"). (DE 18). The United States respectfully requests that this Court deny the Defendant's Motion because the Defendant failed to rebut the statutory presumption of detention under Title 18, United States Code, Section 3142(e)(3)(E) and because the Title 18, United States Code, Section 3142(g) factors favor detention.

## <u>BACKGROUND</u>

On March 2, 2023, a federal grand jury sitting in the Southern District of Florida returned an Indictment charging Mezzoiuso with one count of Attempted Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b), and one count of Attempted Transportation of a Minor with the Intent of Engaging in Sexual Activity, in violation of 18 U.S.C. § 2423(a) and (e). (DE 3).

On March 8, 2023, Magistrate Judge Williams Matthewman held a detention hearing to determine whether the defendant should be detained pending trial. (DE 9). During the hearing, the government proffered evidence and the Court took testimony from Homeland Security

Investigations ("HSI") Special Agent Louise Miller. To summarize, on October 19, 2020, the Minor Victim, who was 16 years old at the time, was encountered by law enforcement. The Minor Victim advised law enforcement that she had arrived from the Bahamas on October 16, 2020. The Minor Victim further advised that she previously visited the United States in July 2020. The Minor Victim told law enforcement that her friend in the United States would set the Minor Victim up with older, rich men to have sex for money.

Law enforcement obtained Customs and Border Protection ("CBP") records confirming that the Minor Victim arrived in the United States from the Bahamas on July 2, 2020. The Minor Victim then returned to the Bahamas on August 28, 2020. The Minor Victim then returned to the United States on October 16, 2020.

The Minor Victim was interviewed on several occasions. During one of the interviews, the Minor Victim provided information regarding a commercial sex act customer who she identified as "Ari." Law enforcement identified "Ari" as the Defendant, a 62-year-old male. The Minor Victim advised that her friend had arranged a "date" with Mezzoiuso via Tinder. According to the Minor Victim, Mezzoiuso provided a ride to his home by utilizing a ride-sharing platform. The Minor Victim advised that the vehicle was sent to her friend's home. The Minor Victim stated that the agreed-upon fee for oral sex was $200. The Minor Victim stated that Mezzoiuso paid her $100 directly, and then sent the remaining $100 to her friend via the CashApp application. The Minor Victim advised that after that date, she had an additional two dates with Mezzoiuso, during which she and Mezzoiuso had sex.

A review of the Minor Victim's cell phone revealed WhatsApp chat messages between the Minor Victim and the user of telephone number 2327; the WhatsApp account for telephone number 2327 included a photograph of Mezzoiuso. Law enforcement obtained records for the

phone number ending in 2327. Law enforcement learned that "Best Doctors Insurance Holdings LLC" was listed as the "Billing Party" and "ARI MEZZOIUSO" was listed as the User of the phone number. Law enforcement obtained Mezzoiuso's wage and hour earnings reports which revealed that Mezzoiuso had worked at Best Doctors Insurance Holdings since 2016.

Law enforcement obtained a subpoena for records from Lyft for the Mezzoiuso, which included his full name, phone number, and a picture of him. The records revealed that on the evening of July 13, 2020, Mezzoiuso's Lyft account was used to pick up a passenger at the Minor Victim's friend's house and drop her off at Mezzoiuso's house. The next morning, on July 14, 2020, Mezzoiuso's Lyft account was used to pick up a passenger at his house and drop the passenger back off at the Minor Victim's friend's house. A search warrant was obtained for historical cell site records for the Minor Victim's phone number in the summer of 2020. The cell site records corroborate that the Minor Victim's phone traveled from the area of her friend's house to the area of Mezzoiuso's house on July 13, 2020, and then traveled from the area of Mezzoiuso's house back to the area of her friend's house on July 14, 2020.

Law enforcement also obtained records from CashApp for Mezzoiuso's phone number. The CashApp records reveal that on the morning of July 14, 2020, Mezzoiuso attempted to send the Minor Victim's friend $200 but was unsuccessful. Later the same morning, Mezzoiuso sent the Minor Victim's friend $100 via Cash App and wrote "For [the Minor Victim's first name]" in the Notes section of the transfer. The sender was listed as "Ari." The source of the payment came from Mezzoiuso's bank, as verified through legal process.

The Minor Victim's cell phone was forensically analyzed. A review of the Minor Victim's cell phone revealed Facebook chat messages between the Minor Victim and Facebook user "Ari Mezzoiuso" beginning after the Minor Victim returned to the Bahamas from the United States. On

October 1, 2020, Mezzoiuso asked the Minor Victim if she wanted to come back and if she could stay with him. When the Minor Victim asked, "To live?" Mezzoiuso responded by stating, "If you want yes." The Minor Victim stated that she did not want to (and could not) live with Mezzoiuso; when Mezzoiuso asked her why, the Minor Victim stated that she was not ready. Mezzoiuso responded by stating, "I don't care about age." The Minor Victim was 17 years old at the time; Mezzoiuso was 62.

A review of the Minor Victim's cell phone revealed WhatsApp chat messages between the Minor Victim and Mezzoiuso at his phone number. On October 1, 2020, Mezzoiuso asked the Minor Victim if she wanted him to buy a roundtrip or one-way ticket. When the Minor Victim responded that she would need a roundtrip flight, Mezzoiuso asked how long she would stay. The Minor Victim told Mezzoiuso that she could not give him her passport information. Mezzoiuso responded, "I can't pay for your flight then. *We met once* and then you next[sic] stayed in touch. I tried many times to reach you remember?" (emphasis added). Law enforcement also located the following WhatsApp chat messages between Mezzoiuso and the Minor Victim on her cell phone:

a. On October 4, 2020, the Defendant tells the Minor Victim that he wants to try two things if she is open minded, stating, "I'll take care of you of course." He tells her he will take care of her on multiple occasions throughout the chat. The Defendant offers to fly to the Bahamas to meet the Minor Victim and tells her to "find a 16 yo girl to join us … And separately find a man close to my age to join us." The Defendant tells the Minor Victim he wants to see a girl pleased and asked if she's "down." The Defendant tells the Minor Victim that he read that the "Legal age for sex is 16 in the Bahamas." When discussing another person joining them, the Defendant states, "Because I would want to see him fuck you. I would fuck you too. That's the fun I'm talking about."

b. On October 5, 2020, the Defendant messages the Minor Victim stating, "Babe the 1st day I'm there it will be just me and you. I want to have sex alone with you. The we invite a 16 yo. And then a guy. I definitely want to see you get fucked. Do you want to come back with me to Miami afterwards?" "If yes, you can with me for as long as you want. I'll buy you the return ticket to Nassau whenever you want to go back home." The Defendant tells the Minor Victim that he is going to get tested and asks if she is going to get tested. When the Minor Victim asks if he wants her to, the Defendant states that he does not want to wear a condom.

c. At one point in the conversation, the Minor Victim confirms that she is not 18. The Defendant sends her a color-coded map of the United States, showing where it is legal to have sex with someone under 18.

d. On October 8, 2020, the Defendant tells the Minor Victim, "I want to spend time fucking you every day we're together and maybe have other join us one night." He tells the Minor Victim that he will fly to Atlanta and fly her there to meet him. The Defendant tells the Minor Victim, "By the way if you never done a 3 some with 2 guys you will love it. Trust me." The Defendant then sends the following series of messages:

   MEZZOIUSO: The legal age for sex in Atlanta is 16 so we can fuck no problem
   MEZZOIUSO: And I'll treat you nicely and look after you. I can teach you things babe. You're in good hands with me.
   MEZZOIUSO: I'll protect you as well
   MEZZOIUSO: Send you all your information so I can book your trip. When you want fly? Anytime starting Saturday. Pick the date. I think you suggested Friday the 16th but you can come sooner
   MEZZOIUSO: Remember I'm getting tested for STDs and HIV tomorrow. I'll send you the results. I do this
   a few times a year just to be safe. Also because I don't like using a condom. Is that Ok?
   MEZZOIUSO: I want you to feel me inside you without the condom in the way.
   MEZZOIUSO: If you like to spend time with me we can discuss you moving in with me when the time is right.

e. While the Defendant initially seems intent on having sex with the Minor Victim in a state where it is legal, he ultimately discusses having sex with the Minor Victim at his home, located in the Southern District of Florida. At one point in the conversation, the Minor Victim explains that she is coming to the United States with her brother and his girlfriend. The Defendant suggests that they stay with him. The Defendant tells her that the rooms are far apart. He states, "So we would not hear them and they would not here us." The Defendant then asks the Minor Victim, "[your brother] would not mind us having sex?" The Minor Victim tells the Defendant that they can just have sex at night. The Defendant responds stating, "Except cannot invite another guy." The Defendant then proceeds to have a conversation with the Minor Victim about having a threesome and tells the Minor Victim that having a threesome is for her and about pleasing her. The Defendant also suggests taking the Minor Victim to a hotel.

f. On October 9, 2020, the Defendant asked the Minor Victim what she likes to do for fun so he can plan what to do. He suggests taking her to Xtreme Action Sports, Gulfstream Park, and Hard Rock Casino "if they allow your age." He then states, "We'll have to wait till your brother and his girl fall asleep to have sex lol," referring again to them having sex in his home located in the Southern District of Florida.

g. On October 12, 2020, the Defendant again states, "Babe if having another guy join us turns you off just tell me. It's not a requirement … I don't want you to feel pressured anything."

The Minor Victim states that she is not sure that she wants to do anything anymore, stating, "That's not the right way to make money." The Defendant responds, stating, "It's just for fun … We can date [if] you want instead." The Defendant then tells the Minor Victim that he can take care of her.

h. On October 12, 2020, the Minor Victim asks the Defendant if Atlanta is where it is legal to have sex at 16. In the conversation that follows that question, the Defendant asks, "You don't want me to fuck you when you stay at my house with your brother and his girlfriend? … I thought you did."

i. During the conversation, the Defendant asks the Minor Victim if she is going to see him in Florida. He offers to pick the Minor Victim up and spend time together but not sleep over. When the Minor Victim agrees, the Defendant states:

MEZZOIUSO: Cool we'll go to Extreme Action Sports
MEZZOIUSO: But we're definitely fucking when you arrive babe. I want you to get used to my cock ok?
MEZZOIUSO:  I'll marry you eventually if you want 😊
MEZZOIUSO: Please don't think that just because I test sexual things I'm being disrespectful. I'm not rest assured
MEZZOIUSO: meant I'm NOT being disrespectful. I sincerely like you.

In October 2020, the Minor Victim returned to the United States. The Minor Victim was encountered by law enforcement just three days after arriving in the United States and was placed in the custody of the Florida Department of Children and Families due to her being underage, until her 18th birthday.

On February 7, 2022, Mezzoiuso returned to Miami from a cruise that traveled to the Bahamas. Mezzoiuso's phone was detained and searched pursuant to CBP's border search authority. A review of Mezzoiuso's phone revealed a conversation via WhatsApp with a phone number with a Panamanian country code saved to the phone as "Mara." During the conversation, on April 20, 2021, Mezzoiuso asked "Mara" if she has had sex with someone younger. When "Mara" said no, Mezzoiuso asked if she had an interest. "Mara" stated that she did not have much interest, but maybe in a few years. Mezzoiuso then replied, "I'd like to see that," "Young teen,"

"14 or 15 with a nice size penis," "Many countries 14 is legal," "Brazil and Colombia…Bolivia and Ecuador…Paraguay and Peru."[1]

A review of Mezzoiuso's phone also revealed a conversation via WhatsApp with a phone number with a Lithuanian country code saved to the phone as "Vilte." A records check revealed that the phone number was assigned to a female with the same first name who is a Lithuanian national and holds a Lithuanian passport. During the conversation, on March 31, 2021, Mezzoiuso asked "Vilte" how old she was when she began "doing this." "Vilte" responded that she has been meeting with different guys since she was 16. Mezzoiuso asked if she is 22 now; "Vilte" responded that she is 19. In response, Mezzoiuso stated, "I like younger so cool." At one point in the conversation, Mezzoiuso asked "Vilte," "When you were 16 how old was the oldest guy that fucked you?" When "Vilte" responded, "Maybe 55," Mezzoiuso stated "That's hot I think…never done that." Mezzoiuso then told "Vilte" that he obeys laws; he stated, "maybe if I travel to Brazil […] the age is 14." Mezzoiuso told "Vilte" that he wishes he met her when she was 16. When "Vilte" responded, "Hmm you obey the law," Mezzoiuso stated, "Met you in Brazil." Mezzoiuso then stated, "Find you a 18 yo boy…I prefer 16 but it's too risky…Maybe we can travel together to a country where the legal age is younger…We'll see. Actually, there are states in the US where the legal age is 17." When "Vilte" stated that she does not want a 16-year-old "kid" and she is "not for kids" as they "don't know how to fuck," Mezzoiuso stated, "We teach him." When "Vilte" pushed back again, Mezzoiuso stated, "Ok 18 then." "Vilte" again expressed disinterest and stated that maybe she can do it once. Mezzoiuso responded, stating, "Once only is fine…Keep me happy in bed and I'll keep you happy." During the conversation, Mezzoiuso and "Vilte" discussed her

---

[1] It should be noted that pursuant to 18 U.S.C. § 2423(b), it is a federal crime for a United States citizen to travel in foreign commerce with a motivating purpose of engaging in illicit sexual conduct with another person. Pursuant to 18 U.S.C. § 2423(c), it is also a federal crime for any United States citizen who travels in foreign commerce to engage in any illicit sexual conduct.

coming to the United States and what she should tell customs officials when she arrives. Mezzoiuso told "Vilte" that she can give his address and tell customs that she is there on vacation.

At the conclusion of the hearing, the Court found that the Defendant failed to rebut the rebuttable presumption under 18 U.S.C. § 3142(e)(3)(E) that no condition or combination of conditions would reasonably assure the safety of the community. (DE 10). Further, the Court found that the Government established by clear and convincing evidence that Defendant, if released, is a danger to the community. Accordingly, the Court concluded that the Defendant should be detained pending trial. The court issued an order, memorializing its findings. (DE 10).

It should be noted that following Mezzoiuso's arrest on March 3, 2023, Mezzoiuso was advised of his *Miranda* rights and agreed to speak to investigators in an audio-recorded interview. During a post-*Miranda* statement, Mezzoiuso admitted to having sexual relations with the Minor Victim the first time they met in person.[2]  Mezzoiuso also admitted to being the user in the chats with the Minor Victim described above. Mezzoiuso also described the content of the chats as "fun texting" and admitted to "fun texting" with other individuals when discussing recruiting a 14-year-old for sex.

On March 8, 2023, while incarcerated in the instant case, Mezzoiuso made an outgoing phone call on a recorded line to the user of phone number ending in 7495. A search of law enforcement databases revealed that the phone number ending in 7495 is associated with Rose Mezzoiuso Nelly (hereinafter, "Nelly"). Law enforcement investigation revealed that Nelly is Mezzoiuso's sister.  A search of law enforcement databases revealed that Nelly currently resides

---

[2] As previously mentioned, the Minor Victim advised law enforcement that she engaged in a commercial sexual act with Mezzoiuso when they first met in the summer of 2020; the Minor Victim was 17 years old at the time.  Cell site records for the Minor Victim's phone number confirmed that the Minor Victim's cellular phone was located at Mezzoiuso's home from July 13, 2020 through July 14, 2020. Mezzoiuso's statement therefore supports that he had sex with the Minor Victim before she turned 18.

in New York. The call lasted approximately 16 minutes. During the call, Mezzoiuso and Nelly discussed two (2) computers which were located at Mezzoiuso's home. Mezzoiuso requested that Nelly take the computers with her when she returns to back to her home in New York. Mezzoiuso asks Nelly to throw out one of the computers when she gets back to New York.  Below is a summary of the discussions regarding the computers located at the Mezzoiuso's home:

> MEZZOIUSO:  Is my computer in the house?  Or did they take it?
> NELLY:  Which one Ari? You have multiple computers here.
> MEZZOIUSO:  No, I don't there is only one computer.
> NELLY:  Oh, the HP in the room with the desk?
> MEZZOIUSO:  Yeah
> NELLY:  Okay, it's here
> MEZZOIUSO: You should take that with you, I can always get another one, okay?
> NELLY:  Okay
> MEZZOIUSO:  The only reason I say take it to New York because there's nothing on it at all.  I only used it for business and research or whatever.  Take it with you to New York because a lot of the stuff is already on there so you don't have to create new passwords or anything like that, I will give you all the passwords, you know?
> MEZZOIUSO:  The government could come back and ask where it is (the laptop). If they need to take it, I will tell them that you have it.  At least you will be able to figure out the websites to make payments.

Later in the conversation, Mezzoiuso advised Nelly of a second computer at his home.

Below is a summary of the conversation:

> MEZZOIUSO:  I have a second computer there.  My old old one.  I'm not sure if I'm going to need it again or throw it out. Do you have room to take two of them?
> NELLY:  I can take whatever you want.
> MEZZOIUSO:  It's in the bathroom.
> NELLY:  In the bathroom?
> MEZZOIUSO:  Yeah, it's in the bathroom because I didn't have space for it in the office.
> NELLY:  Okay, I see it.
> MEZZOIUSO:  That thing is so old...it's like 15 years old.
> NELLY: Does it even work?
> MEZZOIUSO:  Uh…..Uh…..I can't launch any applications with it….um…but, ah, I have spreadsheets in there for investment purposes, real estate investment purposes….ahhh, it's better that you take it and….ahh, throw it out in New York
> NELLY:  okay

On March 10, 2023 a search warrant was issued authorizing law enforcement to search Mezzoiuso's residence, as well as any computers, cellular telephones, and/or electronic storage devices located within the residence, for evidence related to violations of Title 18, United States Code, Section 2422(b) (attempting to persuade, induce, entice, or coerce a minor to engage in sexual activity), and Title 18, United States Code, Section 2423(a) and (e) (attempting to transport a minor to engage in sexual activity). *See* 23-MJ-8134-WM. The search warrant was executed on March 10, 2023. Law enforcement seized two laptops, multiple cellular phones, and several other electronic devices. Law enforcement is in the process of forensically extracting and reviewing the evidence seized during the execution of the search warrant at Mezzoiuso's residence. It should be noted that during the preliminary review of the forensic extractions, law enforcement located at least one image constituting suspected child sexual abuse material.

## DISCUSSION

### A. Legal Standard

The Defendant's appeal is meritless and should be denied. The Defendant failed to rebut the presumption in favor of detention at the detention hearing, and Magistrate Judge Matthewman properly considered the 18 U.S.C. § 3142(g) factors in detaining the Defendant pending trial.

"If a person is ordered detained by a magistrate judge. . .the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The district court reviews the issue de novo. *See United States v. Jeffries*, 679 F.Supp. 1114, 1115 (M.D. Ga. 1987) (citing *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987)); *see also United States v. Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985). In conducting this de novo review, a hearing is not required, and the district court may rely entirely on the pleadings and the evidence developed at the magistrate's detention hearing, or it may conclude

that additional evidence is necessary and conduct its own evidentiary hearing. *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988). If the court finds that no "condition or combination of conditions will reasonably assure the appearance of the person as required, and the safety of any other person and the community," such court shall order the detention of the person before trial. 18 U.S.C. § 3142(e).

While there is a general presumption in favor of releasing defendants on bond pending trial, for certain offenses, including offenses involving minor victims under section 2422 and 2423 of Title 18, the presumption is against release. *See* 18 U.S.C. § 3142(e). Section 3142(e) states: "[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officers finds that there is probable cause to believe that the person committed […] an offense involving a minor victim under section […] 2422, 2423." 18 U.S.C. § 3142(e)(3)(E). The presumption against release is triggered once a magistrate finds probable cause to believe a defendant committed the offenses of which he is accused of committing. *United States v. Medina*, 775 F.2d 1398, 1400 (11th Cir. 1985). A grand jury indictment also provides the probable cause required by the statute to trigger the presumption.[3] *United States v. Hurtado,* 779 F.2d 1467, 1479 (11th Cir.1985). If the statutory presumption against release applies, a defendant is required to meet a burden of production to rebut, which, if met, shifts the burden of persuasion to the government to show the defendant's risk of flight and danger to the community. *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990) (citing *King*, 849 F.2d at 488). If a defendant successfully rebuts the statutory presumption that he is a risk of flight and/or a danger to the community, "the presumption 'remains in the case as an evidentiary finding

---

[3] Importantly here, the Defendant was charged by indictment at the time of the detention hearing, satisfying the probable cause required under section 3142(e) to trigger the presumption.

militating against release, to be weighed along with other evidence relative to the factors listed in Section 3142(g).'" *Id.* (quoting *King*, 849 F.2d at 488). The government would then bear the burden of establishing that the defendant should be detained, either by a preponderance of the evidence that the defendant poses a risk of flight, or by clear and convincing evidence that the defendant constitutes a danger to the community. *Id.* at 917.

The factors to be considered in determining whether to release a defendant pending trial include: (1) the nature and circumstances of the offenses charged, including whether the offense is a crime of violence or *involves a minor victim*; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including family ties, the person's character, ties to the community, and criminal history; and (4) the nature and seriousness of the danger to any person in the community that would be posed by the person's release. 18 U.S.C. § 3142(g) (emphasis added).

B. <u>Argument</u>

Consistent with pretrial services' recommendation and Judge Matthewman's detention order, the Government submits that the Defendant should be detained pending trial under the circumstances of this case. As stated above, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of the community or the appearance of the Defendant because he is facing charges involving a minor victim under sections 2422 and 2423 of Title 18. The Defendant has failed to rebut the presumption of detention. Moreover, the factors enumerated in Section 3142(g) favor detention.

i. **The Defendant Failed to Rebut the Presumption of Detention**

The significant harms and dangers of sex crimes involving minors "animated [ ] Congress to create the statutory presumption of detention." *United States v. Hardy*, 2019 WL 2211210, at

*10 (D.D.C. May 22, 2019). The presumption of detention "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). *See United States v. Epstein*, 425 F. Supp. 3d 306, 315 (S.D.N.Y. 2019).

The Defendant here has proven through his own words and conduct that he has a desire to sexually exploit children, and that he will continue do so unless and until he is removed from society. The crimes with which the Defendant is charged are crimes of violence. *United States v. Champion*, 248 F. 3d 502, 506 (6th Cir. 2001) (recognizing that violations of federal statutes designed to protect minors constitute a crime of violence). Additionally, as used in sections 3124, a "'crime of violence" means any felony under chapter 77, 109A, 110, or 117." 18 U.S.C. § 3156(a)(4)(C). Sections 2422 and 2423 are contained in chapter 117; thus, the Defendant is charged with having committed "crimes of violence." The Defendant poses a serious risk of danger to the community which weighs in favor of his continued detention. See *United States v. Bivins*, Criminal Action No. 7:11–cr–19 (HL), 2011 WL 2182239, at *2 (M.D. Ga. June 3, 2011) ("By including the crimes involving minor victims in the statutory language of § 3142(g) Congress has shown that is considers [child pornography crimes] to be significant in terms of dangerousness."). *See United States v. Ensley*, No. 1:12-MJ-1460-LTW, 2012 WL 5463899, at *4 (N.D. Ga. Nov. 8, 2012).

While the Defendant has attempted to rebut the presumption of detention by providing the Court with a set of bond conditions that include "restricting access to a cell phone and computer," DE 18 at 6, the offenses committed by the Defendant and his desire to engage in sexual activity with minors cannot be suppressed simply by a restrictive set of bail conditions. *See* United States v. Minnici, 128 F. App'x 827, 829 (2d Cir. 2005). The Defendant seeks to be released to his home.

The Defendant is a serial online predator who attempted to sexually exploit minor victims <u>from his home</u>. The fact that the Defendant was able to commit these crimes from the comfort of his own home proves that there are no conditions that could reasonably assure the safety of the community if the detention order is revoked. Releasing the Defendant would allow him to return to the very place from which he committed these crimes – his home. Further, the Defendant's exploitation of children could be undertaken within the confines of his home where the Defendant may gain access to the Internet. Pretrial services lacks the capacity to engage in constant and comprehensive surveillance of the Defendant in his home. Restricting a Defendant's internet access would also be ineffectual when one considers the fact that a person can visit websites by using cellular data, rather than Wi-Fi. Courts have repeatedly noted that, generally, prohibiting internet access to someone on release is "a near impossibility given the internet's ubiquitous presence[.]" *See United States v. Galvan*, No. 3:20-cr-19, 2020 WL 4604502, at *6 (S.D. Tex. Aug. 11, 2020) (rejecting similar argument and citing *United States v. Voelker*, 489 F.3d 139, 145 (3d Cir. 2007)); *United States v. Foster*, No. 20-5548, 2020 WL 6791572, at *3 (6th Cir. July 20, 2020) (finding that "[t]here is simply no failsafe way to prevent any and all exposure [to potential victims] even if a defendant forfeits all electronic devices and is denied access to the Internet").

At Mezzoiuso's detention hearing, the court concluded that the "Defendant is a danger to the community and to minors in the community, and that no condition or set of conditions will reasonably assure the safety of any other person and the community." DE 10 at 5. The court came to such a conclusion after considering "the nature and circumstances of Defendant's charges (which involve a minor victim), the lengthy prison time he faces if convicted, the strong weight of the evidence against him, the Government's proffer and evidence as to Defendant's enticing a minor and engaging in sex with a minor, Defendant's apparent fixation on minors, the results from

Defendant's seized phone, the testimony of HSI Special Agent Miller, the Abbreviated Pretrial Services Report, the Pretrial Services Report, and Pretrial Services' recommendation that Defendant be detained, as well as other facts elicited at the hearing." *Id*. The court found that the Defendant "failed to rebut the presumption under 18 U.S.C. § 3142(e)(3)(E) that no condition or combination of conditions will reasonably assure the safety of the community." The government submits that the Defendant has failed to overcome the presumption in favor of detention.

### ii. The Section 3142(g) Factors Favor Detention

### 1. Nature and Circumstances Of The Offense Charge

The nature of the crimes charged – attempted coercion and enticement of a minor to engage in sexual activity and attempted transportation of a minor to engage in sexual activity - weighs heavily against release. The Defendant used the internet to attempt to lure the Minor Victim to engage in sexual activity with him in the Untied States. "Sexual exploitation of children via the internet, even without physical contact, harms children in real and lasting ways." *United States v. Pece*, No. 1:20-CR-186-1, 2020 WL 6263640, at *5 (N.D. Ohio Oct. 23, 2020); *See New York v. Ferber*, 458 U.S. 747, 758–59, & nn.9–10, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982) (quoting studies finding that "sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults"). The nature and circumstances of the Defendant's offenses, as well as his willingness to have sex with minors as young as 14-years-old, indicate that he will be a danger to the community should he be released.

The serious nature of the offenses charged in the Indictment is also reflected in the penalties associated with the offenses. In addition to carrying a presumption of dangerousness due to the involvement of a minor, Congress has imposed a mandatory minimum of ten years' incarceration

for attempted enticement of a minor (and a maximum penalty of life imprisonment), and a mandatory minimum of ten years' incarceration for attempted transportation of a minor. The mandatory minimums indicate the seriousness of the crimes.[4] The legislative history of 18 U.S.C. § 2422 illustrates that Congress intended to impose lengthy mandatory-minimum sentences in child sexual abuse cases to demonstrate the danger that such offenses present to children.[5] Therefore, these mandatory sentences reflect a Congressional determination that individuals who sexually exploit minors are inherently dangerous. The nature and circumstances of the offenses therefore weighs strongly in favor of detention.

### 2. Weight Of The Evidence Against Defendant

The evidence against the Defendant is strong and substantial. First, the Defendant has already been indicted by the Grand Jury and thus probable cause has been established. *See United States v. Norris*, 188 F. App'x 822, 830 (11th Cir. 2006) (A "grand jury indictment conclusively establishes probable cause to implicate a person in a crime."). Second, law enforcement recovered WhatsApp chat messages, Facebook messages, ride-sharing account records, bank records, and taped oral statements from both Defendant and the Minor Victim supporting the crimes charged in the Indictment. The Facebook and WhatsApp chat messages recovered from the Minor Victim's phone show the Defendant engaging in sexually explicit conversations with the Minor Victim and persuading her to engage in sexual activity with the Defendant. The Defendant admitted to

---

[4] Although the government did not appeal the Magistrate Judge's finding that the Defendant was not a flight risk, it should be noted that the Defendant surely has incentive to flee given that he faces a long minimum mandatory sentence if convicted of these charges.

[5] The Joint Explanatory Statement of the Committee of Conference for The Protection of Children from Sexual Predators Act of 1998 (PROTECT Act), Pub.L. No. 105–314 § 203(a)(1), 112 Stat. 2974 (1998), evinces a congressional recognition of the seriousness of attempted sexual enticement of a minor. The PROTECT Act changed the sentence for a violation of § 2422(b) from a maximum of fifteen years imprisonment to a mandatory minimum of five years and a maximum of thirty years. On July 27, 2006, Congress passed the Adam Walsh Child Protection and Safety Act of 2006 (Adam Walsh Act), Pub.L. No. 109–248, § 203, 120 Stat. 587, 613 (2006), amending § 2422(b) to include a mandatory minimum of ten years imprisonment and a maximum of life.

communicating with the Minor Victim. He even admitted to having sex with the Minor Victim the first time they met. The Defendant's Lyft, CashApp, and bank account records serve as evidence that the Defendant and Minor Victim met before she turned 18. The Minor Victim's taped interviews further corroborate the documentation recovered supporting the charges in the Indictment. The Defendant's WhatsApp chat messages with other women indicating an interest in having sex with minors also serves as evidence of his intent and desire to engage in sexual activity with minors. Collectively, the evidence supports the crimes charged and the danger the Defendant poses to the community.  The weight of the evidence accumulated against the Defendant indicates that he should be detained.

### 3.  History And Characteristics Of The Defendant

Although the Defendant does not have any criminal arrests or convictions, the evidence in this investigation reveals that his criminal conduct has been pervasive for a period of time. The government presented evidence that the Defendant met with the Minor Victim in July 2020, exchanged sexually explicit messages with her in October 2020, and exchanged messages with other women about having sex with minors in March and April 2021. Further, while the Defendant has no prior criminal history, Although this is the Defendant's first arrest, "this ... alone does not preclude detention." *Music,* 2007 WL 2067057, at *5 (citing *United States v. Abad,* 350 F.3d 793, 798 (8th Cir. 2003). In fact, because many child sexual abuse cases are not reported to law enforcement, not every offender has a criminal record, or has a criminal record that includes sexual offenses. In *Abad*, 350 F. 3d at 797, the Court recognized that "[d]etaining adults who prey on children for the adult's sexual gratification . . . is also a legitimate government objective.  One of the fundamental duties of government is public safety, including protecting children from sexual predators."  In determining dangerousness, the Eighth Circuit noted that Abad had "no prior

criminal history.  However, the nature of the crime charged – sexual activity with a minor – weighs heavily against release. Strong evidence links Abad to this crime of violence." *Abad*, supra at 798.

Further, the Defendant's post-arrest conduct weighs in favor of detention. Specifically, the Defendant's communications with his sister during his incarceration about throwing out one of the computers in his home, raises concerns about the Defendant's attempts to conceal or destroy evidence. As previously mentioned, law enforcement has observed at least one image constituting suspected child sexual abuse material during their preliminary review of the devices located in the Defendant's home. This attempt to destroy evidence is inconsistent with the Defendant's claim that he has been "cooperative with law enforcement," DE 18 at 10, and weighs in favor of his detention pending trial.

**4.      Nature and Seriousness Of Danger To Any Person Or The Community That Would Be Posed By The Person's Release**

Finally, in addressing the nature and seriousness of danger to any person or the community that would be posed by the defendant's release, the Government submits that Defendant is a danger to the community for all the reasons described above. In short, the evidence establishes that Defendant is a serial online sexual predator of minors. Despite knowing the illegality of his actions (the Defendant went as far as discussing where he believed it was legal to have sex with minors in the United States and abroad in his texts), the Defendant continued to try to find and entice minors to engage in sexual activity. The Defendant's strong interest in having sexual relations with children weighs in favor of detention.

Several courts throughout the country reviewing the detention orders of defendants facing similar charges and circumstances have ruled that pretrial detention is appropriate. See, e.g., *United States v. Abad*, 350 F.3d 793 (8th Cir. 2003) (reversing district court's order of release and finding that defendant with no prior criminal history posed a serious danger to the community

when he, inter alia, had the minor engage in "web-cam sex" and then travelled out of state to engage in sexual relations with the minor); *Untied States v. Minnici*, 128 Fed. Appx. 828 (2d Cir. 2005) (affirming district court's pretrial detention order for a defendant charged with enticement of a minor and travelling to have sex with a minor); *United States v. Malenya*, --- F. Supp. 2d ---, 2012 WL 472915 (D.D.C. 2012) (finding pretrial detention appropriate where defendant with family ties to the community, prior military service, and no prior criminal history enticed a 14-year old minor to engage in sexually explicit conduct); *United States v. Burdette*, 813 F. Supp. 2d 1 (D.D.C. 2011) ( finding pretrial detention appropriate where defendant, inter alia, attempted to get an undercover officer posing as a minor to engage in sexually explicit conduct via webcam and attempted to travel even though Defendant had no criminal history and worked as a defense contractor for the federal government); *United States v. Cutter*, 637 F. Supp. 2d 348 (W.D.N.C. 2009) (finding pretrial detention appropriate where defendant attempted to entice an undercover agent posing as a minor to engage in sexually explicit conduct and traveled to have sex even though the defendant had no prior criminal history, no funds to flee, and his family volunteered to be a third party custodian); *U.S. v. Mercedes,* 254 F.3d 433, 438 (2d Cir.2001) (reversing the decision of the district court to release the defendant, even though the defendant had no prior criminal record). Similar to the cases cited herein, the United States contends that Defendant should be detained pending trial.

**<u>CONCLUSION</u>**

The presumption in favor of detention, when considered in connection with the Defendant's conduct in this case, compels the conclusion that the Defendant should be detained. The Defendant has failed to rebut the statutory presumption in favor of detention. The weight of the evidence against Defendant is strong and shows that he would pose a continuing risk of harm

and danger to minors and the community if released. There are inadequate conditions to address this risk, and the balance of the § 1342(g) factors weigh in favor of detention. The Defendant's release poses a significant risk of the further exploitation of the children. The protection of the community can be assured only by his continued detention. For these reasons, the United States submits that the Defendant should be detained pending trial, affirming Judge Matthewman's order of pretrial detention.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: _____
Elena Smukler
Assistant United States Attorney
Florida Bar No. 91025
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9444

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed electronically onto the Court's CM/ECF system and sent via CM/ECF to all counsel of record on August 2, 2021.

_____
Elena Smukler
Assistant United States Attorney